ILLINOIS HOUSING DEVELOPMENT AUTHORITY, Plaintiff-Appellant, v. ARBOR TRAILS DEVELOPMENT et al., Defendants-Appellees.

Third District   No. 80-93

Opinion filed May 12, 1980.

Alan S. Ganz, of Rooks, Pitts, Fullagar & Poust, of Chicago, and Dunn, Leinenweber & Dunn, of Joliet, for appellant.

Paul E. Freehling, of Pope, Ballard, Shepard & Fowle, of Chicago, and Herschbach, Tracy & Johnson, of Joliet, for appellees.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Illinois Housing Development Authority (hereinafter Authority), a body politic and corporate of the State of Illinois (Ill. Rev. Stat. 1979, ch. 67½, par. 301 *et seq.*), appeals from the order of the Circuit Court of Will County denying its request for preliminary injunctive relief against defendants Arbor Trails Development (hereinafter Arbor), an Illinois limited partnership, John Telander, Robert Telander, Mrs. John Telander, also known as Gloria Miller, and Telander Bros. Contractors, Inc., an Illinois corporation.

The Authority was created by statute in 1967 to provide low and moderate income housing for Illinois citizens. It stimulates and encourages such housing development by providing low-interest, low-downpayment mortgage loans to developers and by using Federal subsidies granted to or passed through the Authority. After the completion of a development, the relationship between the Authority and the developer is governed by three documents. In addition to the mortgage agreement and the mortgage note, there is a regulatory agreement, a contract unique to subsidized housing. That agreement is designed to insure that a development is used for low or median income housing and that the funds generated by a development are allocated in a specified manner. It provides for Authority oversight over an owner's conduct in operating a development.

In the instant case, the Authority had authorized a mortgage loan of $8,145,000 at an interest rate of 1%, achieved largely through Federal interest subsidies, to Arbor. Arbor's cash outlay, to receive the mortgage loan, was $114,000, or 1.4% of the replacement value of the development. The necessary documents were executed, and the focus in the instant case is on the regulatory agreement between the Authority and Arbor. In pertinent part, under the agreement:

(1) Arbor assumed liability for funds or property of the Development coming into its hands which it was not entitled to retain, and for any of its own acts in violation of the agreement.

(2) Arbor agreed to establish a reserve fund for replacements in a separate account, with specified monthly allocations.

(3) Arbor agreed not to assign, transfer, dispose of or encumber any personal property of the Development, including rents, or pay out any funds, other than from surplus cash, except for reasonable operating expenses and necessary repairs, without the prior written approval of the Authority.

(4) Arbor agreed not to make, receive, or retain any distribution of

assets or income of the Development, except from surplus cash and except under certain specified exceptions, without the prior approval of the Authority.

(5) Arbor agreed to maintain a separate trust account for any security deposits collected, which account would have at all times an amount in it equal to or exceeding the aggregate outstanding obligations under the account.

(6) Arbor agreed not to incur any liability, except for current operating expenses, without the prior written approval of the Authority.

Arbor also agreed to deposit rents and receipts of the Development as specified in the agreement, with limitations on the use and withdrawal of such funds by Arbor. Paragraph 16 of the agreement specified the Authority's power to declare a default under the agreement when a violation persists for over 30 days after notice from the Authority. Under such default, paragraph 16 provided that the Authority may:

"(d) Apply to any court, State or Federal, for specific performance of this Agreement, for an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the Development in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to the Authority arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain."

The mortgage contained a provision which specified that the mortgagor would make specified monthly deposits, as determined by the Authority, in an account designated by and controlled, directed and supervised by the Authority.

In 1977, the Authority became seriously concerned with the financial status and management of the development and about alleged violations of the agreement pertaining to provisions above set forth. In October 1977, it ordered an audit. In February 1978, the Authority authorized that the loan to Arbor be declared in default, and it authorized the appointment of a new managing partner for Arbor. The Arbor partnership agreement, approved by the Authority, provided as article III(f):

"That if the Partnership receives a loan, as provided for in the Act, the Chairman of the Authority, shall have the power, if he determines that any such loan is in jeopardy of not being repaid * * * or the Partnership is otherwise in violation of rules and regulations to appoint to the Partnership a Partner who, solely and without interference from Partners, shall have the power to conduct the entire affairs of the Partnership, notwithstanding any other provisions of this Agreement or any other provisions of law."

The default letter was sent in May 1978 to the defendants, and the Telanders, with their attorneys, appeared at the Authority's September 1978 meeting to discuss the matter. The attorneys appeared again at the October 1978 meeting.

Subsequent to the meetings, on January 31, 1979, the chairman of the Authority, by its authorization, appointed a managing partner of Arbor. Guilford Management Corp., an Illinois corporation, was appointed managing partner. The Telanders have never recognized the validity of the appointment of Guilford as managing partner, and they have retained control and management of the Development through and including the present suit. In April 1979, the Authority filed a 17-count complaint against the defendants requesting both equitable and legal relief. The complaint alleges breach of contract, fraud, breach of fiduciary duty, conversion, civil conspiracy to defraud, waste and tortious interference with contract. In December 1979, the Authority moved, in circuit court, for preliminary injunctive relief as to three counts of its complaint. (1) It sought to enjoin the Telanders, individually, and Arbor from using any funds generated by the Development, for defense of the instant suit, and it sought to require the defendants to refund any amounts already expended on the suit. (2) It sought to enjoin Gloria Telander, also known as Gloria Miller, who had been managing the Development since its completion, from further managing it. (3) It sought to enjoin John and Robert Telander and Arbor from interfering with the Guilford Management Corp., appointed as managing partner by the Authority. (4) It sought to enjoin Gloria from misappropriating tenants' security deposit funds and sought replacement of the funds found to have been diverted by her from the fund.

Thus, the main thrust of the request for preliminary injunctive relief was the installation of Guilford as managing partner to begin managing the development, without interference from the Telanders or Arbor. The circuit court heard six days of testimony with voluminous exhibits upon the motion for a temporary injunction. At the conclusion, the court made certain oral findings. It found no evidence that the injunctive relief was necessary because of a danger to the lives or safety of the residents of the development. Furthermore, the court found that there was no evidence that the Authority's bond status would be impaired if the preliminary relief were denied. With regard to violations of the regulatory agreement, the court found that there were violations of a strict interpretation of the agreements, but the court also found that the violations were of a static nature, occurring some time before the relief sought and continuing over an extended period of time.

The court also noted that some of the alleged violations were apparent to the Authority for some time, yet nothing was done or said about them. Based upon the findings as to the nature and duration of

violations, the court found it inappropriate to grant the preliminary injunctive relief, since the granting of such relief would serve to upset the status quo as it had existed for some time. The court, in weighing the benefits and detriments of such relief, also found that to grant the relief would "cause extreme difficulties" for the defendants, in the event they prevailed on the merits. Essentially, the court found that the preliminary injunctive relief was not necessary to preserve the status quo and that neither the Authority nor the Development would be irreparably harmed without such relief. In addition, the defendants would be greatly harmed if the relief were granted and they were to win on the merits. While the court granted an injunction against the expenditure of any further Development funds for defense purposes, a practice which had ceased prior thereto, all other requested injunctive relief was denied.

It is from denials of its requests for injunctive relief that the Authority appeals. Fortunately, we need not go into the merits of the action nor into most of the evidence presented during the six-day hearing on preliminary injunctive relief. The Authority, in its brief to this court, did not seriously challenge the pertinent findings of the circuit court on the issue of the necessity for injunctive relief. The primary basis of the Authority's appeal is its contention that the circuit court erred in applying traditional equitable principles to the Authority's request for preliminary injunctive relief. The argument is advanced that the legislature, in the IHDA, acted to exempt the Authority from traditional equitable standards when enforcing agreements, so as to facilitate its obtaining temporary injunctive relief without regard to established equity practice. Alternatively, it argues that the Authority should have been granted injunctive relief under those traditional principles, based upon the evidence. Finally, it argues, by way of reply brief, that the court failed to make a necessary finding, which failure renders its decision erroneous and unsupportable. Various other arguments, concerning the merits of the action, are also made, but they have no place before us on this appeal.

The principles governing the granting of preliminary injunctive relief are well known and long established.

"The issuance or denial of a preliminary injunction is addressed to the trial court's sound discretion. Its findings will not be disturbed unless they are against the manifest weight of the evidence. [Citation.] A reviewing court should confine itself to a determination of whether the trial court has properly exercised its broad discretionary powers; each substantive issue should be considered only insofar as necessary to determine whether there has been an abuse of discretion." *Booth v. Greber* (1977), 48 Ill. App. 3d 213, 217-18, 363 N.E.2d 6.

"For a preliminary injunction to issue, the party seeking the injunction must carry the burden of persuasion on four issues: (i)

that he has no adequate remedy at law and will be irreparably injured if the injunction is not granted; (ii) that the threatened injury to him will be immediate, certain and great if the injunction is denied while the loss or inconvenience to the opposing party will be comparatively small and insignificant if it is granted; (iii) that he has a reasonable likelihood of prevailing on the merits of the case; and (iv) that granting the preliminary injunction will not have an injurious effect upon the general public." (*McCormick v. Empire Accounts Service, Inc.* (1977), 49 Ill. App. 3d 415, 417, 364 N.E.2d 420.)

The purpose of the preliminary injunction, as both sides agree, is to preserve the status quo, being the last peaceable and uncontested status which preceded the pending controversy. While preliminary injunctions are not favored by the courts, aversion to them is heightened where granting such relief would be to give the relief that could be obtained only after a hearing on the merits. (*P.S.L. Realty Co. v. Granite Investment Co.* (1976), 42 Ill. App. 3d 697, 356 N.E.2d 605.) In the instant case, the Authority argues, initially, that these principles should not apply, since the Illinois Housing Development Act (Ill. Rev. Stat. 1977, ch. 67½, par. 301 *et seq.*) mandates such relief and overrides and removes traditional standards for the issuance of preliminary injunctive relief.

That argument is based on section 2(k) of the Act, which states, in pertinent part:

"As used in this Act:

\* \* \*

(k) 'Limited-profit entity' means any individual, joint venture, partnership, limited partnership, trust or corporation organized or existing under the laws of the State of Illinois or authorized to do business in this State and having articles of incorporation or comparable documents of organization or a written agreement with the Authority which, in addition to other requirements of law, provide:

(1) \* \* \*

(2) that if the limited-profit entity receives a loan, as provided for in this Act, the Chairman of the Authority, acting with the prior approval of the Authority, shall have the power, if he determines that any such loan is in jeopardy of not being repaid, or that the proposed development for which such loan was made is in jeopardy of not being constructed, or the limited-profit entity is otherwise in violation of the rules and regulations promulgated by the Authority, to appoint to the board of directors or other comparable controlling body of such limited-profit entity a number of new directions or persons, which number shall

be sufficient to constitute a voting majority of such board or controlling body, notwithstanding any other provision of the limited-profit entity's articles of incorporation or other documents of organization, or of any other provisions of law." (Ill. Rev. Stat. 1977, ch. 67½, par. 302(k).)

This section, as applied in the instant case, merely states Arbor, to receive a loan, had to have a provision in its partnership agreement providing for appointment by the chairman of the Authority of a sufficient number of persons to control the partnership, in the event the chairman determines the loan is in jeopardy or that violations have occurred. The partnership agreement had such a provision, otherwise the partnership would not have qualified for participation in the program. Article III(f) provided:

"That if the Partnership receives a loan, as provided for in the Act, the Chairman of the Authority, shall have the power, if he determines that any such loan is in jeopardy of not being repaid * * * or the Partnership is otherwise in violation of rules and regulations to appoint to the Partnership a Partner who, solely and without interference from Partners, shall have the power to conduct the entire affairs of the Partnership, notwithstanding any other provisions of this Agreement or any other provisions of law."

The Authority, on appeal removes the language with respect to the chairman's power of appointment in section 2(k) from the context of that section. The context, as is evident, is that the power shall be stated in the articles of incorporation, or comparable documents of organization, or a written agreement, of a limited-profit entity, if the limited-profit entity wishes to qualify as such under the Act. The Authority takes the language of section 2(k) pertaining to the chairman's power and construes it as a separate and direct grant of such power to the chairman by the legislature. It then goes on to see in such direct grant of power a legislative intent that it should be effected and enforced, at the will of the Authority, without regard to standard equitable principles.

■■ The Authority sees in the language of section 2(k) a direct grant of power to its chairman to make the appointment set forth and also a grant to it of the right to enforce that power, through injunctive relief, without regard to the rules of equity. The argument of the Authority is totally without foundation in section 2(k). By no reasonable construction of the language involved can section 2(k) be read as is suggested by the Authority. Section 2 is a definitional section of the Act, and part (k) defines the term "limited-profit entity." It defines what such an entity's organizational documents must contain in order for it to qualify under the Act. The section does not address injunctive relief or equity or the powers of the Authority to sue and be sued at all. The section does not grant to the Authority any powers, but simply mandates that the power of appointing new management must be provided for in appropriate documents by

anyone seeking to qualify as a "limited-profit entity." A legislative determination and mandate that the Authority was to have the power to institute a civil action for preliminary injunctive relief, without regard to equity principles, in order to enforce its appointment powers under a separate document, would not have been buried in a definitional portion of the Act, under a definition unrelated to the Authority's powers, in language unrelated to judicial relief. Had the legislature wished and intended to grant the Authority the power and rights the Authority now argues it has been granted, the legislature could have done so by express provision, as it did in the Environmental Protection Act. Ill. Rev. Stat. 1977, ch. 111½, pars. 1042(d), 1043.

■ The cases from other jurisdictions, based upon interpretations of the phrase "notwithstanding any other provision of law" in totally different contexts, are totally inapposite and unpersuasive. The Authority's arguments based on the Environmental Protection Act are supportive more of the defense position, for the reason that there the legislative intent is clear and directly expressed. The argument that such extraordinary power is needed by the Authority to prevent developers from detrimentally affecting the Authority's status and the developments, during a pending action to enforce an agreement, is unconvincing. If the Authority can prove irreparable harm to it or the development from continued management by a developer, as well as the other requisites of equitable relief, then a circuit court could grant injunctive relief to stop acts of mismanagement by a developer. In the instant case, the Authority was unable to establish those requisite bases for temporary injunctive relief. We find that the Act does not provide for dislocation of traditional equitable principles when the Authority seeks to enforce a regulatory agreement or other documents or seeks damages for violations of such documents. The circuit court did not err in applying established equity principles to the Authority's request for preliminary injunctive relief.

■ Alternatively, citing *Western Auto Supply Co. v. Chalcraft* (1958), 16 Ill. App. 2d 461, 148 N.E.2d 592, the Authority argues that the court under equitable principles, should have granted relief to prevent the improper use of funds. In that case, however, the circuit court granted injunctive relief to preserve the status quo until a trial on the merits. The appellate court concurred in the trial court's reasoning and found no abuse of discretion in granting the relief. In the instant case, the findings of the trial court as pertaining to the status quo are not challenged by the Authority, nor are they against the manifest weight of the evidence. The pertinent findings indicate that the violations occurred long ago or have continued, largely, over the period of time the development has been operating, at least prior to the severe disagreements between the Authority and Arbor. The court found that to grant injunctive relief would be to upset the present status quo.

■ The Authority also argues, in passing, that equitable relief of a preliminary nature should have been granted, regardless of equitable principles, because the regulatory agreement provides that the Authority may provide for injunctive relief against violations of the Agreement. Yet, that is exactly what the Authority has done in the instant case; it has applied for injunctive relief. The Agreement provision does not purport to grant the Authority the right to preliminary injunctive relief without regard to the law thereon. Nor do we perceive that any such attempted waiver or alteration of the rules of equity, by private agreement, would be binding on the courts. The decision of the court denying the requested relief is supported in the evidence and we find no abuse of discretion.

■ In its reply brief, the Authority attempts to challenge the court's findings in that it argues that the court failed to adequately address the issue of the status quo. It faults the circuit court's failure to make an express finding as to what the status quo was in the case. The argument is lacking in foundation. The court made findings as to the nature and duration of the violations. The court heard six days of testimony which indicated that the defendants had been in control of the management of the development since it began operation and that the deficiencies in payment or other financial irregularities had continued over a period of time, some with knowledge on the part of the Authority. It is obvious that the status quo was that situation which had existed for some time, largely prior to the default letter and the attempted appointment of new management. The Authority argues that the status quo was with Guilford Corporation as managing partner. Yet, Guilford has never managed the development. To argue that Guilford, solely by virtue of its appointment, has been the managing party is to ignore the facts and reality of the situation, and it ignores one of the main reasons for bringing the instant suit, to place Guilford in that position and to remove the defendants.

■ As to the Authority's objection to the court's characterization of the relief sought as a "mandatory injunction," we find such characterization makes little difference, for whether termed mandatory or prohibitory, the Authority did not satisfy its burden of showing the need for preliminary relief sought. We would note that the court's characterization seems correct, given that the main thrust of the relief was to install Guilford as managing partner.

In view of our determinations, those issues raised in the initial brief, which argued the merits of the alleged violations, are not necessary for us to determine. The decision of the circuit court of Will County is affirmed.

Affirmed.

STOUDER and STENGEL, JJ., concur.