PEORIA SAVINGS AND LOAN ASSOCIATION, Plaintiff-Appellee, *v.* AMERICAN SAVINGS ASSOCIATION *et al.*, Defendants-Appellants.

Third District   No. 82—514

Opinion filed October 18, 1982.—Rehearing denied November 30, 1982.

Stephen C. Sandels, John R. Doyle, and Steven H. Hoeft, all of McDermott, Will & Emery, of Chicago, and David Mueller, of Cassidy & Mueller, of Peoria, for appellants.

Lyle W. Allen, of Heyl, Royster, Voelker & Allen, and David B. Radley, of Baymiller, Christison & Radley, both of Peoria, for appellee.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

This interlocutory appeal is from an order of the circuit court of Peoria County granting a preliminary injunction to halt the merger of

Peoria Savings and Loan Association with American Savings Association.

In July of 1981, American Savings Association was created by the merger of Citizens Savings of Belleville, Illinois, and Quincy People Savings and Loan Association of Quincy, Illinois, into American Savings and Loan Association of Springfield, Illinois. American has assets of approximately $900 million and has a net worth of about $22 million with 28 branch offices in western and central Illinois. During the same period of time, Jack Shinn, the executive vice-president of American, was also negotiating the possible acquisition of the Champaign Loan and Building Association of Champaign, Illinois, and the Mt. Vernon Savings and Loan Association of Mt. Vernon, both of which were in serious financial trouble. Shinn also discussed the possibility of merger with Samuel McFarland, president of Peoria Savings and Loan Association, and on August 4, 1981, Shinn presented to Peoria a plan for a proposed merger between Peoria and American. Peoria has assets of approximately $155 million, net worth of $11.2 million, and three branch offices in the Peoria area. Shinn was acting in accordance with the philosophy that savings and loan associations can best survive the current economic depression of their industry by diversifying and expanding market areas through mergers that would increase the size of the main association, that would expand into other major retail markets, that would permit "economies of scale," and that would generate profits from new business to offset the losses resulting from current high interest rates and the mismatch of short-term high-cost liabilities (deposits) with long-term low-yielding assets (mainly residential mortgage loans). At the time of the proposed merger, American was averaging $700,000 in monthly losses while Peoria was averaging approximately $150,000 monthly losses.

The merger proposal stated that tentative merger agreements had been entered into between American and two other savings and loan associations, one with assets of $150 million, a net worth of 1½ percent and nine retail outlets, and the other with assets of $100 million, a net worth of two percent, and four retail outlets. These were the Mt. Vernon and Champaign associations. American indicated that it was negotiating with the Federal Savings and Loan Insurance Corporation to obtain financial assistance as a condition for these mergers. The Peoria merger proposal included, "American Savings will go forward with these merger plans only with adequate F.S.L.I.C. assistance." The Peoria Board of Directors approved the proposed merger agreement on November 17, 1981, and the agreement was signed by McFarland, Peoria's president, the next day. The executed agreement did not mention the proposed Mt. Vernon-Champaign mergers. A key

provision of the agreement is that entitled "Conditions of Closing." "From the date hereof to the Closing, which for the purposes hereof shall mean the date on which the Certificate of Merger is issued by the Office of the Savings and Loan Commissioner of the State of Illinois and is recorded in the Office of the Recorder of Deeds of Sangamon County, Illinois and Peoria County, Illinois, *there shall not have been any material adverse change in the financial condition* or results of operations of any of the Merging Associations ***." (Emphasis added.)

Joint application for approval of the merger was submitted to the Illinois Savings and Loan Commissioner and to the Federal Home Loan Bank Board. The Illinois Commissioner approved the merger on December 22, 1981, but Federal approval was delayed until March 4, 1982. In the meantime, on November 30, 1981, American entered into merger agreements with the Mt. Vernon and Champaign associations, and applications for these two mergers were filed with both the State and Federal agencies. Final approval of these mergers was received on December 28, 1981, and the certificates of merger were recorded on December 31, 1981.

During the course of negotiations with Mt. Vernon and Champaign, it was learned that financial assistance in the form of monetary aid was no longer available for supervisory mergers. However, the FSLIC was willing to permit the use of "purchase accounting" as a form of assistance where a weaker association merges into a stronger one. Under purchase accounting, American can discount the newly acquired assets of the Mt. Vernon and Champaign associations to market value and can amortize the markdown as good will over a period of time up to 40 years. Since the amortization period is longer than the average repayment time of existing loans, the net effect is to show an increase in income during the early years of the merger while spreading expenses over the longer life of the good will, thereby improving the profit position of American. The applications for approval of the Mt. Vernon-Champaign mergers were prepared with the help of Peoria's chief financial officer, Roger Kilpatrick. These applications included projections based upon the combined financial data of Peoria and American along with data showing the result of the additional merger with Mt. Vernon-Champaign. Thus the applications were based on projections that presupposed the completion of the merger of Peoria with American.

On February 8, 1982, the board of directors of Peoria met in a special session and approved a resolution to withdraw from the merger with American. The resolution recited that just prior to its merger with American, the Champaign association had a net worth of

slightly under $30,000 and the Mt. Vernon association had a net worth of slightly under $600,000; that the two associations had combined net losses for the month of December of $700,000 which would produce a negative net worth within two months; that American had acquired the assets and assumed the liabilities of the two associations without any assistance from Federal agencies; that the acquisition of the two associations without assistance constituted a material adverse change in the financial condition of American; that American cannot for long absorb the substantial losses which all three associations have been sustaining; and that to continue the proposed merger would not be in the best interest of Peoria, its shareholders and depositors, its employees and the community in which it operates.

Peoria then attempted to withdraw the application pending before the Federal Bank Board and also requested the Illinois Commissioner to rescind his December 22 approval of the merger. Both agencies refused Peoria's request, and Federal approval of the merger was given on March 4, 1982. Peoria immediately filed suit for an injunction to prevent the recording of the merger certificate. A temporary restraining order was entered *ex parte* on March 12, and thereafter a three-week trial was held. On July 1, 1982, the court ordered that a preliminary injunction issue enjoining American from recording the merger documents and from taking any further steps toward consummation of the merger. American then perfected this interlocutory appeal pursuant to Illinois Supreme Court Rule 307 (87 Ill. 2d R. 307).

■ Initially American contends that Peoria failed to establish the prerequisites for the issuance of a preliminary injunction. It has been held that a preliminary injunction will not be issued unless there is a probability of success on the merits and a need to preserve the status quo in order to prevent an irreparable injury for which there is no adequate remedy at law. (*McErlean v. Harvey Area Community Organization* (1972), 9 Ill. App. 3d 527, 292 N.E.2d 279.) This court has, in addition, required a showing that the threatened injury would be immediate, certain and great if the injunction were denied, while the loss or inconvenience to the opposing party would be relatively small if it were granted, and also a showing that granting the injunction will not have an injurious effect upon the general public. (*Illinois Housing Development Authority v. Arbor Trails Development* (1980), 84 Ill. App. 3d 97, 404 N.E.2d 1097.) The order in the instant case must be examined in light of these requirements.

The trial court expressly found that Peoria is likely to prevail on the merits of this cause and that American sustained material adverse change in its financial condition as a result of its mergers with Mt. Vernon and Champaign, which were accomplished without the consent

of Peoria's board of directors, who were not provided with written notice or financial information. The court also found that Peoria would suffer irreparable harm if the merger were completed since Peoria would cease to exist as an entity as soon as the certificate was recorded and, therefore, would have no adequate remedy at law. Implicit in these findings is a determination that American's defenses of waiver, estoppel and failure to pursue administrative remedies would not be reasonably likely to prevail.

■ The necessity of preserving the status quo to prevent the termination of Peoria's existence would seem to satisfy the requirement that irreparable harm be shown. American urges that it offered "in open court" to permit Peoria to maintain its identity as a separate division of American during the course of the litigation. However, this seems only to be an offer to keep separate books while using Peoria's assets. In the record is defendant's exhibit No. 35 where the regional director of the Federal Home Loan Bank Board stated in his January 19, 1982, report that American (after its merger with Peoria) would have a projected 29 month survival time but with the proposed merger of American-Peoria with Mt. Vernon-Champaign, using the current rate of loss experienced individually by the associations, the merged entity would survive only 20-24 months before net worth would be depleted. We think this is sufficient evidence to support a finding that a merger of assets would harm Peoria irreparably, even if separate books and a separate identity were maintained during the course of the litigation of this cause. By the time final judgment is entered, Peoria might well have no assets remaining to be returned. Thus we believe the "irreparable harm" requirement was met in this case, regardless of American's oral offer to preserve Peoria's identity during litigation.

■ Furthermore, since the filing of the certificate would terminate Peoria's existence, there can be no adequate remedy at law because there would be no entity to bring a legal action. The applicable statute provides: "When duly recorded, the certificate of merger is conclusive evidence *** of the merger and of the correctness and validity of all proceedings in connection with the merger." (Ill. Rev. Stat. 1981, ch. 17, par. 3167(c).) Accordingly, once the merger certificate is recorded, Peoria would have no standing to pursue a legal remedy and, in the face of "conclusive evidence" of validity of the merger, Peoria would have no legal basis for asserting a cause of action. The legal consequences of the recording of the merger certificate fulfill the requirement that the threatened injury to Peoria be immediate, certain, and great as compared to the loss or inconvenience to American. The evidence indicates that American has been denied

use of the assets of Peoria to improve its financial condition, but its existence is not immediately threatened by postponement of the merger.

██ American also contends that Peoria failed to sustain its burden of establishing that there would be no adverse effect upon the general public if the injunction were granted. We disagree. We think the trial court could reasonably infer that there would be no harm to the general public from the fact that both American and Peoria are private corporations, as opposed to governmental, and that both will continue to exist and serve their respective communities if the status quo if maintained. Such an inference is sufficient to meet the "no adverse effect on the public" requirement.

██ The real heart of this case is contained in American's contentions relating to its defenses, all of which are really part and parcel of the argument that the preliminary injunction should not have been issued because Peoria failed to establish a reasonable likelihood of success on the merits of its case. It is important to keep in mind that the purpose of a preliminary injunction is to preserve the status quo until the trial court can have an opportunity to consider and decide the merits of the case, and in ruling on an application for such relief, controverted facts are not determined and the merits are not decided. (*Longergan v. Crucible Steel Co.* (1967), 37 Ill. 2d 599, 299 N.E.2d 536.) In a case involving an interlocutory appeal from the denial of a motion for preliminary injunction, the reviewing court stated:

> "The only question reviewed in such an appeal is whether there was a sufficient showing to sustain the order of the trial court granting or denying the relief sought. [Citations.] Therefore, in the case before us, we can decide only whether, prima facie, plaintiffs showed the trial court that there was a fair question as to existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if evidence sustains their allegations; and that matters should be kept in status quo until the cause could be decided on its merits." *Schwalm Electronics, Inc. v. Electrical Products Corp.* (1973), 14 Ill. App. 3d 348, 352, 302 N.E.2d 394, 397-98.

In the instant interlocutory appeal, we may not decide controverted issues of fact or determine the merits of Peoria's breach-of-contract claim, but rather we must consider whether the trial court abused its discretion in finding that there was a reasonable likelihood of Peoria succeeding on the merits of its case.

The first defense asserted by American is that Peoria's cause of action is barred for failure to exhaust its administrative remedies.

American reasons that Peoria should have sought administrative review of the decisions of the Illinois Savings and Loan Commissioner approving the merger application and then refusing to rescind that approval.

The determining factor here is that Peoria is not challenging the action of the Commissioner in approving the merger of American and Peoria. That approval was given on December 22, 1981. American's acquisition of the Mt. Vernon and Champaign associations occurred on December 28, 1981. It was this event occurring without "adequate FSLIC assistance" as promised, which caused the alleged "material adverse change" in American's financial condition, and it was this event which apparently triggered Peoria's decision to withdraw from the merger. The fact that Peoria asked the Commissioner to rescind his approval does not signify an election of administrative remedies by Peoria but rather indicated an effort to revoke its participation in the joint application for merger. Peoria undertook comprehensive action to extract itself from an undertaking that seemed unwise and inadvisable, obviously moving on "all fronts" to halt the merger.

■ American has cited such cases as *Kankakee Federal Savings & Loan Association v. Becker* (1961), 23 Ill. 2d 477, 179 N.E.2d 22, as authority for its argument that administrative review should have been pursued, but those cases are distinguishable because they challenge the correctness of the administrative rulings, while Peoria does not. Peoria is seeking judicial relief for an alleged breach of contract by American which occurred after the Commissioner's administrative action was complete. We conclude that Peoria had no basis for seeking administrative relief.

American's next contention is that Peoria is barred from withdrawing by the doctrines of waiver and of equitable estoppel. American says that Peoria knew that the Mt. Vernon-Champaign merger was conditioned upon American's merger with Peoria, that Peoria had full knowledge of the financial ramification of all the mergers, and yet Peoria voiced no objections to the Mt. Vernon-Champaign mergers prior to its decision to withdraw. Under the doctrine of equitable estoppel, where one party fails to assert a contract right and the other party construes the silence as consent and changes position in reliance thereon, the party who remained silent is estopped to assert that contractual right later. (*E.g., Jurek v. Smuczynski* (1965), 61 Ill. App. 2d 426, 209 N.E.2d 850.) American claims that it completed the mergers with Mt. Vernon-Champaign in reliance upon completion of the American-Peoria merger, and that Peoria knew American was acting in reliance on its merger because Peoria's chief financial officer, Kilpatrick, helped prepare the financial reports and other merger documents

which reflected the intended American-Peoria merger. Also, both Kilpatrick and Peoria's president, McFarland, were informed in early December 1981 that the Mt. Vernon-Champaign mergers were proceeding with the use of purchase accounting. These facts are asserted as being sufficient to estop Peoria from claiming that American's actions amounted to a breach of contract.

American advances a parallel argument as to the applicability of the doctrine of waiver. It is insisted that Peoria waived any right to complain about the Mt. Vernon-Champaign merger causing a material adverse change because Peoria's conduct prior to the Mt. Vernon-Champaign merger might reasonably be construed as showing that it did not intend to assert its right to terminate its merger with American on that basis. (See, *e.g., Business Development Services, Inc. v. Field Container Corp.* (1981), 96 Ill. App. 3d 834, 422 N.E.2d 86.) Because members of Peoria's management worked on the Mt. Vernon-Champaign merger, American argues that Peoria intentionally waived its right to claim that American experienced a material adverse change due to the Mt. Vernon-Champaign merger. American relies upon the legal theory that the knowledge of the officers and agents of a corporation is to be imputed to the corporation itself.

Contained within these two issues are numerous disputed factual questions. For example, the estoppel defense is predicated on the assumption that Peoria knew that American would not have undertaken the Mt. Vernon-Champaign mergers without assurance that the Peoria merger would be completed. However, that is really a much disputed fact. On the basis of the record, we think it most unlikely that Peoria had knowledge that the subsequent mergers were conditioned upon the completion of the Peoria merger. Although it would have been a fairly simple matter to include an express provision to that effect in the merger proposal, no reference to any other mergers was made a part of the agreement presented to Peoria. In addition, the estoppel argument also assumes that Peoria had full knowledge of the financial effect the Mt. Vernon-Champaign merger would have upon the consolidated American association. Much of the evidence heard by the trial court involved that very issue, and it was not at all clear that Peoria or its agents in fact fully understood the effect of the subsequent mergers particularly without direct monetary aid from the Federal government. On February 9, 1982, Shinn, American's chief executive officer, provided McFarland, president of Peoria, with copies of the information in the Champaign and Mt. Vernon merger applications, including five-year projections using Peoria's financial data. The cover letter stated, "we regret that this information had not previously been made available to you; however, there was no attempt to keep

this information from you. It was merely an oversight." Obviously the entire question of how much knowledge Peoria is charged with has no clear-cut answer.

■ In addition to the disputes just discussed, American insists that Peoria and its board of directors are chargeable with everything that was known to Kilpatrick, Peoria's financial officer who was assigned by Peoria to assist American in the preparation of the necessary merger documents for the Mt. Vernon-Champaign merger as well as for other financial projects. Peoria insists that Kilpatrick was a "loaned employee" who had very limited assignments while working for American. Peoria argues that under the "loaned servant" doctrine, Kilpatrick became the employee of American, not Peoria, and thus that Peoria should not be held to have notice of all the information which Kilpatrick had access to in the course of his employment at American. Peoria also argues that American failed to establish that Kilpatrick had sufficient information to determine that the merger would cause a material adverse change in the financial condition of American. American disagrees. These are both matters for resolution after a trial on the merits. It seems clear to us that the evidence was sufficiently contradictory to raise issues of credibility, and that there was sufficient evidence to support a determination that Peoria is likely to succeed on the merits. We cannot say that the trial court abused its discretion on this point.

The final contention of American also related to the question of whether Peoria had a reasonable likelihood of success on the merits, although American's argument is framed solely in terms of the merits themselves. American argues that its financial condition did not in fact suffer a material adverse change as a result of the Mt. Vernon-Champaign merger, if proper consideration is given to the depressed condition of the savings and loan business and to the advantages of obtaining a broader geographical area for marketing operations. American also insists that authorization to use purchase accounting was a form of financial assistance equivalent to monetary aid and well within the meaning of the term "financial assistance" as used in documents furnished by American at the time of the original merger proposal. We cannot agree. While purchase accounting permits the long-term write-off of the loss in market value of an association's assets, this merely prevents the immediate insolvency of the firm but does not add any money or other property of value to the firm's business. There was considerable evidence that use of purchase accounting was not the form of financial assistance which Peoria would have considered acceptable if it had been stated explicitly at the time the merger proposal was discussed. We believe, as apparently did the trial court,

that Peoria has a reasonable likelihood of success on the question of whether it had knowledge that purchase accounting was an alternative form of financial assistance expected in the Mt. Vernon-Champaign mergers.

We agree with Peoria that American's stance in this entire cause has been based upon its contention that it would never have merged with Mt. Vernon-Champaign without Peoria's financial strength. That position presupposes that without Peoria there would be a material adverse change in American's financial condition as a result of the merger with the two weaker associations. The evidence is quite strong that the Federal agency considered the impact of the Mt. Vernon-Champaign merger to have an adverse effect upon American. In addition to the decrease in American's survival time, during the first month after the Mt. Vernon-Champaign merger American lost nine percent of its net worth, and experienced sharp decreases in the ratio of net worth to assets and net worth to liabilities. Also, there was testimony by Shinn that he would have stopped the Mt. Vernon-Champaign merger without Peoria, and testimony from several expert witnesses that American had indeed experienced a material adverse change in financial condition.

American also argues that Peoria should not be able to assert such facts as a decline in net worth ratios or survival time as reasons for withdrawal from the merger, but that Peoria should be limited to the reasons stated in its February 8, 1982, resolution. The stated reason for withdrawal was the material adverse change in American's financial condition. We believe Peoria has continued to assert only one reason for withdrawal. The factual matters which American finds objectionable are, in our view, relevant to establish that a material adverse change in American's financial condition did in fact occur.

■ Without going into further detail, we think it clear that a breach of contract can, in all reasonable likelihood, be established by Peoria. The test in this case, as indicated previously, is whether the trial court abused its discretion in determining that Peoria has a reasonable likelihood of being successful in a trial on the merits. The test is not whether the findings of the trial court were contrary to the manifest weight of the evidence. Using the proper test, we conclude that the trial court's findings and order were not erroneous and should be affirmed.

We also note that American did not file the transcript of proceedings as a part of the record on appeal within the time allowed. In such a situation, the reviewing court is required to assume that the evidence presented in the trial court supported the rulings of the trial court. (*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237.) How-

ever, in the exercise of our judicial discretion, we have elected to deal with the issues argued on appeal, rather than resort to a perfunctory affirmance, because, obviously, we believe the issues of this case are of sufficient importance to require our full consideration. However, we affirm the trial court in any event.

Affirmed.

STOUDER and HEIPLE, JJ., concur.