773 F.2d 892
 The COUNTY OF COOK, a body politic and corporate, and The
People of Cook County, ex rel. Richard M. Daley, State's
Attorney of Cook County, and City of Chicago, a municipal
corporation and a body politic, Plaintiffs-Appellants,
v.
MIDCON CORPORATION, et al., Defendants-Appellees.
 No. 83-3125, 83-3160.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 7, 1985.
Decided Sept. 24, 1985.
 
 John Touhy & Joseph Witkowski, Shea, Rogal & Assoc. Frank J. Parkerson, Asst. State's Atty., Chicago, Ill., for plaintiffs-appellants.
 Michael M. Conway, Hopkins & Sutter, Charles W. Boand, Wilson & McIlvaine, Chicago, Ill., for defendants-appellees.
 Before WOOD, CUDAHY and FLAUM, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 These appeals concern events related to a 1981 corporate reorganization involving Peoples Energy Corporation, MidCon Corporation and their corporate subsidiaries. Plaintiffs, the City of Chicago and the County of Cook, brought a class action on behalf of gas consumers against the various corporate defendants, their officers and directors, and their independent auditor, Arthur Andersen & Co., alleging that defendants had violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-1968, ("RICO") by conducting the affairs of MidCon, Peoples Energy and their subsidiaries through a pattern of racketeering. Specifically, plaintiffs claim that Peoples Energy's two utility subsidiaries, Peoples Gas Light and Coke Company and North Shore Gas Company, engaged in a scheme to defraud which began when those subsidiaries obtained rate increases between 1977 and 1980 on the basis of intentional misrepresentations that such increases were necessary to provide adequate and efficient utility service. Thereafter, plaintiffs allege, the utility subsidiaries diverted the revenues derived from the rate increases by paying excessive dividends to Peoples Energy, which invested the proceeds in nonutility subsidiaries. The scheme allegedly came to fruition in the 1981 reorganization, in which Peoples Energy divested the nonutility subsidiaries to MidCon. Plaintiffs also brought various pendent state claims.
 
 
 2
 While this suit was pending, a judgment was rendered in a state court action which also concerned the reorganization. Thereafter, the district court granted defendants' motions to dismiss the RICO claims, on the alternative grounds of collateral estoppel and failure to state a claim. The court also dismissed the state law claims on the basis of res judicata and collateral estoppel. Plaintiffs now appeal.
 
 I.
 
 3
 The district court's opinion dismissing plaintiffs' actions is reported at 574 F.Supp. 902 (N.D.Ill.1983). For the convenience of the reader we reprint the district court's statement of facts in its entirety:
 
 
 4
 "Before filing complaints in this court, the County of Cook and the City of Chicago were parties to two consolidated cases before Judge George J. Schaller of the Circuit Court of Cook County, Chancery Division. The proceedings in the state court commenced August 20, 1981, when several of the defendants in this action, Peoples Energy Corporation, MidCon Corporation, and Natural Gas Pipeline Company of America, filed a complaint against the Illinois Commerce Commission which sought, inter alia, an injunction against interference with a planned corporate reorganization. Peoples Energy proposed to transfer the common stock of its nonutility subsidiaries to a newly incorporated holding company, MidCon Corporation, in exchange for MidCon stock which was to be distributed to shareholders of Peoples Energy on a pro rata basis. Under the plan, Peoples Energy would continue to hold the common stock of its two public utility subsidiaries, The Peoples Gas Light and Coke Company and North Shore Gas Company. On September 3, 1981 the Illinois Commerce Commission filed a separate action against Peoples Energy, MidCon and Natural, as well as Peoples Gas Light and North Shore, seeking to enjoin the proposed reorganization; this suit eventually was consolidated with the already pending action in which the Commerce Commission was a defendant.
 
 
 5
 "Cook County intervened in the state litigation on September 16, 1981 as a defendant to the affiliated corporations' suit for injunctive relief against interference with the reorganization by the Illinois Commerce Commission, and as a counterplaintiff seeking to enjoin the proposed Peoples reorganization. By this time, various other parties also had intervened in the proceedings as defendants and counterplaintiffs; among them were the State of Illinois, the Governor's Office of Consumer Service, an agency of the Illinois executive branch, Business and Professional People for the Public Interest, Inc., a not-for-profit corporation, and the South Austin Coalition Community Council, a not-for-profit community organization. In September and October 1981, Judge Schaller conducted a five-week hearing on the parties' cross motions for preliminary injunctive relief. On October 23, 1981, he issued a 54-page decision, granting a preliminary injunction to Peoples and its affiliates, and denying such relief to the Illinois Commerce Commission, Cook County, and the other intervenors. After obtaining the approval of shareholders, Peoples and its affiliates implemented the reorganization on November 30, 1981. According to plan, control of the nonutility subsidiaries was transferred to MidCon from Peoples Energy, the remaining corporate parent of the two public utility subsidiaries.
 
 
 6
 "Cook County filed an amended counterclaim before Judge Schaller on February 4, 1982, seeking a declaratory judgment that the Peoples reorganization was void, and praying for a permanent injunction requiring the corporations involved in the reorganization to undo what they were attempting to accomplish. Thereafter, on April 27, 1982, Judge Schaller granted the City of Chicago leave to intervene as an additional defendant-counterplaintiff. The City's intervention was subject to various terms and conditions: Chicago was to be bound by all orders previously entered by the state court; it was not to raise new issues or add new parties; finally, it was not to interfere with the control of the litigation in a manner which promoted injustice or caused undue delay. In its counterclaim, the City, too, sought an order granting declaratory and injunctive relief reversing the Peoples reorganization transaction.
 
 
 7
 "In their counterclaims, the City and the County alleged that the Peoples reorganization was an ill-conceived attempt to circumvent the jurisdiction of the Illinois Commerce Commission while the corporations involved deprived consumers of the benefits of assets properly belonging to the rate base of the public utilities, Peoples Gas and North Shore, by transferring those assets to MidCon. Cook County specifically alleged that excessive dividend payments extracted from the utility subsidiaries, combined with Peoples Energy's investment policy of investing these funds in its nonutility holdings, constituted an arrangement which facilitated the exchange of utility assets to MidCon when the reorganization took place. As a consequence of the reorganization, consumers were injured, both parties contended, by having to pay increased gas prices while receiving less reliable service. These core allegations were repeated in virtually every pleading filed by the other intervening parties.
 
 
 8
 "After obtaining the preliminary injunction, the Peoples affiliates filed a motion on October 28, 1981 for permanent injunctive relief. Judge Schaller then set July 6, 1982 as the trial date for hearing on the merits all the various claims and counterclaims of the parties.
 
 
 9
 "On May 6, 1982, before the trial before Judge Schaller, Cook County filed a complaint in this court, alleging as a basis of federal jurisdiction that defendants, the corporations involved in the reorganization, various of their officers, directors, and their accountant, violated RICO by effecting the reorganization through a concerted pattern of racketeering. The City of Chicago filed a virtually identical complaint on May 26, 1982. These two actions were consolidated by this court's order of June 11, 1982. The gravamen of the RICO allegations before this court is that the reorganization was the culmination of a scheme to defraud consumers of their right to receive adequate and efficient utility service at just and reasonable rates by transferring to MidCon assets that properly belonged to the utilities. The major steps in this scheme to defraud, which took place between 1977 to 1981, are alleged by plaintiffs to be that:
 
 
 10
 (1) Defendants caused the utility subsidiaries to pay excessive dividends to Peoples Energy.
 
 
 11
 (2) They then used Peoples Energy to invest these dividends in subsidiaries which were nonutilities.
 
 
 12
 (3) Meanwhile, defendants made misrepresentations to the Illinois Commerce Commission and to the public, stating that these dividends were not excessive and that their investment program would benefit the utility subsidiaries and their consumers.
 
 
 13
 (4) Defendants made plans to reorganize by transferring the nonutilities to a newly incorporated MidCon Corporation without disclosing those plans to the public until January 1981.
 
 
 14
 (5) Misrepresentations were made that the reorganization would not result in higher gas rates for the customers of Peoples Gas Light and North Shore and would have no adverse effect on the financial condition of either company.
 
 
 15
 (6) Finally, in late 1981, the scheme to defraud was consummated when the reorganization took place, leaving the nonutilities with a new corporate parent, MidCon, while North Shore and Peoples Gas Light remained subsidiaries of Peoples Energy. As a result of all the foregoing, plaintiffs allege, the utilities had become under-capitalized and the public, having been deprived of the benefits of assets generated by the utilities, has had to pay higher prices for less efficient utility services.
 
 
 16
 Plaintiffs further aver that defendants committed multiple acts of mail fraud, as prohibited by 18 U.S.C. Sec. 1341, by using the United States mails in furtherance of their scheme to defraud. Included among these mailings were proxy statements, Form 10-K filings to the Securities and Exchange Commission, annual reports, press releases, transfers of assets, and various correspondence, including communications between officers and directors. Except for proxy statements issued by defendants when shareholder approval of the reorganization was sought, no mention of these mailings is made elsewhere in the complaint. The City and County allege that the proxy statements seeking shareholder approval of the reorganization were unconditionally certified by defendant Arthur Andersen & Co., the accountant of the corporate defendants, even though the statements determined dividends declared on common stock for MidCon on a different basis than dividends declared on common stock for Peoples. These inconsistent accounting methods, plaintiffs maintain, 'concealed the intentionally indirect transfer of assets from Peoples Gas Light and North Shore to MidCon.'
 
 
 17
 "In addition to claiming that defendants' alleged misconduct violated RICO, the City of Chicago appended to its complaint Counts II through IV, seeking to impose an accounting and constructive trust on the corporations and their officers for breach of their fiduciary duties under state law.
 
 
 18
 "On July 2, 1982, only four days before all claims were to be heard on their merits, Cook County and Chicago filed motions to dismiss their counterclaims in the state proceedings voluntarily. These motions were granted by Judge Schaller. This development, however, did not terminate the participation of Chicago and Cook County in the state litigation. Despite the withdrawal of their counterclaims, they elected to remain in the state suit as intervening defendants by virtue of their answers, still on file, to the complaint for injunctive relief of Peoples Energy and its affiliates.
 
 
 19
 "Cook County and Chicago also made pretrial motions in limine on July 2, 1983. These motions sought to limit evidence accepted and findings made in the state proceedings to the issue of the jurisdiction of the Illinois Commerce Commission over the Peoples Energy reorganization. If the motions in limine were granted, evidence concerning the effect of the reorganization on the public interest, the utilities and their consumers would have been excluded from the hearing; this issue, Chicago and Cook County contended, was raised solely in the counterclaims of the other intervenors, and was irrelevant to a determination whether a permanent injunction should issue in favor of Peoples Energy and its affiliates against the Illinois Commerce Commission's attempted exercise of jurisdiction. Judge Schaller, however, denied the motions in limine, remarking from the bench that he realized that plaintiffs were concerned about the possible collateral estoppel effects of his judgment, but that they had remained in the suit at their own election.
 
 
 20
 "In July and August 1982, Judge Schaller conducted a trial in the Circuit Court of Cook County, hearing the merits of the claims for declaratory and injunctive relief of Peoples Energy and its affiliates, as well as the counterclaims of the Illinois Commerce Commission and the intervening defendant-counter-plaintiffs for declaratory judgments, a permanent injunction, the imposition of fines and other relief setting aside the Peoples reorganization. At this trial, Cook County and Chicago were afforded a full opportunity to examine and cross-examine witnesses and to introduce documentary evidence. Cook County, in fact, called its own expert witness, Pat A. Laconto, to testify on the effect of the reorganization on the cost of capital to the utilities. During the trial, which lasted 19 days, nearly 300 exhibits and the testimony of 17 witnesses were introduced into evidence. Judge Schaller heard considerable evidence concerning Peoples' dividend, investment and acquisition practices, and the alleged transfer of utility assets to MidCon through the reorganization; moreover, evidence was introduced about the effect, if any, of the foregoing on the public interest, the utilities and their consumers.
 
 
 21
 "On November 19, 1982, Judge Schaller issued an exhaustive 97-page opinion, setting forth the court's findings of facts and conclusions of law, in support of an order granting the corporate defendants in this action all the relief that they requested from the state court and denying the relief sought by the ICC and the various intervenors. The court found that the Peoples Energy reorganization was beyond the jurisdiction of the Illinois Commerce Commission because it did not involve the regulated utility subsidiaries, Peoples Gas Light and North Shore. The reorganization was effected by transferring from Peoples Energy to MidCon, both of whom are not utilities, the stock of nonutility subsidiaries. Moreover, Judge Schaller concluded, no assets of the regulated subsidiaries had been transferred in connection with the reorganization; nor was their capitalization, capital stock, or retained earnings altered as a consequence of the reorganization. Accordingly, he entered a declaratory judgment that the Illinois Commerce Commission lacked jurisdiction over the Peoples reorganization.
 
 
 22
 "The state court further granted Peoples Energy and its affiliates permanent injunctive relief against interference with the reorganization by the Illinois Commerce Commission, determining that declaratory relief was an inadequate legal remedy and that issuance of the injunction would prevent irreparable harm to the companies and would not disserve the public interest. In conjunction with his determination that the public interest would not be disserved by issuance of the injunction, Judge Schaller made the following specific findings of fact:
 
 
 23
 (1) The reorganization has not impaired the gas supply of the two regulated utility subsidiaries, Peoples Gas Light and North Shore, or their ability to service their respective customers.
 
 
 24
 (2) Further, the reorganization has not impaired the financial viability of the utility subsidiaries or their ability to raise capital.
 
 
 25
 (3) The payment by the utility subsidiaries to Peoples Energy of approximately 85% of their net income as dividends was neither excessive, illegal, or improper.
 
 
 26
 (4) Neither the decision of Peoples Energy not to reinvest these dividend payments in its utility subsidiaries nor the investment of these monies in nonutility subsidiaries which were eventually transferred to MidCon was illegal or improper.
 
 
 27
 (5) Moreover, the Illinois Commerce Commission may not lawfully consider the earnings and assets of nonutility businesses in setting rates for utility businesses. Therefore, before the reorganization, the Commission could not look to the financial viability of Peoples Energy or any of its nonutility subsidiaries in setting rates for Peoples Gas Light and North Shore.
 
 
 28
 (6) Further, the utility subsidiaries and their consumers did not have any right to claim benefits in Peoples Energy's investment program in its nonutilities.
 
 
 29
 (7) Neither the dividend payout policy, nor Peoples Energy's reinvestment program in its subsidiaries, nor its nonutility acquisition program caused any damage to consumers by adversely affecting either rates or quality of service.
 
 
 30
 (8) Consequently, no harm was imposed on the utilities or their consumers as a result of the transfer of the nonutility subsidiaries from Peoples Energy to MidCon.
 
 
 31
 The same findings that supported the grant of injunctive relief in favor of Peoples Energy and its affiliates also provided grounds for denying the relief sought by the Commission and the intervenors who had counterclaimed. Specifically, Judge Schaller noted that injunctive relief was being denied the intervening defendant-counterplaintiffs because, given the court's findings, they had not established injury. At one point in his decision the judge observed that, despite the withdrawal of their counterclaims, Cook County and Chicago had 'remained in the case as party defendant[s] with all [the] rights of part[ies] and participated fully in the trial on the merits.'
 
 
 32
 County of Cook v. MidCon Corporation, 574 F.Supp. at 905-08.
 
 II.
 
 33
 The district court concluded that the principle of collateral estoppel bars plaintiffs' RICO suit because the propriety of each element of the alleged scheme to defraud was previously decided in the state court reorganization proceedings. Under collateral estoppel principles (or "issue preclusion"), "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Generally, in determining the preclusive effect of a prior state court judgment, we give the same full faith and credit to the judgment that it would receive in the courts of the state from which the judgment emerged. 28 U.S.C. Sec. 1738; Allen v. McCurry, 449 U.S. at 96, 101 S.Ct. at 415. Plaintiffs argue that state collateral estoppel principles cannot be invoked to bar relitigation of issues essential to a claim that is within the exclusive jurisdiction of the federal courts, and thus, since in their view RICO claims are exclusively federal, we may not apply Illinois preclusion law to bar this federal suit.
 
 
 34
 It is by no means clear that federal courts have exclusive jurisdiction to hear RICO claims.[1] However, even assuming that RICO jurisdiction is exclusively federal, the Supreme Court's recent decision in Marrese v. American Academy of Orthopaedic Surgeons, --- U.S. ----, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) makes it clear that this circumstance would not eliminate the need for examining state preclusion law to determine the collateral estoppel effect of a previous state court judgment. In Marrese, the Court interpreted its previous decision in Kremer v. Chemical Construction Corporation, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), to mean that "absent an exception to [the full faith and credit statute, 28 U.S.C. Sec. 1738], state law determines at least the issue preclusive effect of a prior state judgment in a subsequent action involving a claim within the exclusive jurisdiction of the federal courts." Marrese, 105 S.Ct. at 1332. Thus, our task is first to refer to Illinois law to determine the preclusive effect of issues that were decided in the state litigation. Only if we conclude that state law would bar relitigation of any or all issues material to this federal action must we then consider if an exception to 28 U.S.C. Sec. 1738 should apply. See Marrese, 105 S.Ct. at 1333. Therefore we now turn to an examination of the application to this suit of Illinois collateral estoppel principles.
 
 III.
 
 35
 In general, collateral estoppel precludes relitigation of issues in a subsequent proceeding when (1) the party against whom the estoppel is asserted was a party to the prior adjudication, (2) the issues which form the basis of the estoppel were actually litigated and decided on the merits in the prior suit, (3) the resolution of the particular issues was necessary to the court's judgment, and (4) those issues are identical to issues raised in the subsequent suit. See, e.g., Whitley v. Seibel, 676 F.2d 245, 248 & n. 1 (7th Cir.), cert. denied, 459 U.S. 942, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982); Raper v. Hazelett and Erdal, 114 Ill.App.3d 649, 70 Ill.Dec. 394, 449 N.E.2d 268 (1983). We first turn to plaintiffs' central contention that the district court erred in determining that the issues resolved by the state court's findings in the reorganization litigation are identical to the issues raised in this federal RICO suit.
 
 
 36
 As the district court noted, the provisions of RICO which plaintiffs allege were violated by defendants prohibit, inter alia, persons associated with an enterprise involved in interstate commerce from conspiring to conduct, or conducting, the affairs of such an enterprise through a "pattern of racketeering activity." See 18 U.S.C. Secs. 1962(c) and (d). A pattern of racketeering activity may be demonstrated by the existence of two or more predicate acts, see 18 U.S.C. Sec. 1961(5), which may be acts that are prohibited under the federal mail fraud statute. See 18 U.S.C. Sec. 1961(1). The basic elements of a mail fraud offense are (1) a scheme to defraud and (2) use of the mails for the purpose of executing the scheme. E.g., Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); United States v. Azzarelli Construction Co., 612 F.2d 292, 298 (7th Cir.1979), cert. denied, 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980). Here, plaintiffs claim that defendants conspired to defraud consumers of Peoples Gas and North Shore by fraudulently directing revenues received as a result of rate increases granted to those companies during the years 1977 through 1981 to finance, develop and capitalize MidCon. The steps in this scheme are alleged to have begun with intentional misrepresentations made in order to obtain the rate increases. Thereafter, plaintiffs contend, the utilities made excessive dividend payments to Peoples Energy, which instead of reinvesting capital in the utilities chose instead to invest capital in high-risk, nonutility ventures. When the ventures proved profitable, defendants implemented the reorganization in which Peoples Energy divested itself of the nonutilities and spun them off to MidCon.
 
 The district court concluded that:
 
 37
 [A]lthough recast to fit RICO, the allegations that are at the core of the 'scheme to defraud' pleaded by Chicago and Cook County, already have been adjudicated adversely to them in the Circuit Court of Cook County. That court, too, concerned itself with the legality, propriety, and impact of the corporate defendants' reorganization as well as the legality, propriety, and impact of their dividend payout and investment practices which preceded the reorganization.
 
 
 38
 County of Cook v. MidCon Corporation, 574 F.Supp. at 918. We need not repeat here each of the state court determinations that the district court found constituted decisions on issues also presented in this case. We have carefully reviewed the decision of Judge Schaller, who presided over the state court proceedings, and conclude that the district court correctly characterized the impact of the findings made in that decision. See County of Cook v. MidCon Corporation, 574 F.Supp. at 918-19. Judge Schaller specifically found that the dividend payments made by the utility subsidiaries were neither excessive, nor illegal nor improper in any way. He also found that defendants' decision to invest those dividend revenues in the nonutility subsidiaries, instead of the utilities, was legal and proper, and did not adversely affect either the quality of service rendered or the rates charged by the utilities. Finally, Judge Schaller found that Peoples Energy's divestiture of the nonutilities to MidCon was outside the jurisdiction of the Illinois Commerce Commission, and, in any event, did not impair the financial viability of the utility subsidiaries, their ability to raise capital or serve their customers, or in any other respect cause any damage to the utilities or their consumers. Given these findings, we can reach no other conclusion but that the district court correctly determined that all the essential features of the alleged scheme to defraud were already considered, and found to be without merit, in the state reorganization proceedings.
 
 
 39
 But the plaintiffs contend that the district court paid insufficient attention to their central allegation that the rate increases obtained between 1977 and 1981, not the subsequent dividend payments, investment policies and reorganization, form the core of plaintiffs' contentions that defendants engaged in a scheme to defraud. Plaintiffs insist that the district court erred by characterizing the beginning of the scheme as the payout of dividends, when instead, "the only misrepresentation controlling to [defendants'] scheme is the misrepresentation that rate increases were necessary to provide adequate and efficient utility service when they were actually being diverted for the purpose of capitalizing MidCon," an issue which plaintiffs contend was never considered by the state court. County Br. at 26.
 
 
 40
 First, the nature of the misrepresentation as to rate increases alleged by plaintiffs is not clearly delineated. They appear to be saying not that there was no conventional basis for an increase (such as a need to earn an appropriate rate of return on a rate base) but rather that, whatever the conventional basis, the funds generated were not reinvested in the utility subsidiaries but instead were the source of asset diversion to MidCon. Thus the focus here is not so much on the falsity of the information on which the increases were based as on an alleged failure to disclose additional information about the intended eventual disposition of the revenues generated. It is therefore not a simple matter to disentangle fraud about the need for increases from fraud in diverting enhanced revenues to MidCon.
 
 
 41
 Moreover, the record indicates that plaintiffs' allegations regarding fraudulently obtained rates were at all times a part of the state reorganization case, and Judge Schaller made specific findings relating to those allegations. The fact that Judge Schaller did not refer to the precise language that plaintiffs now employ to describe the rate increases as fraudulently obtained does not mean that the issue of the propriety of the increases decided in the state suit is not "identical" to the issue presented here. As plaintiffs note, the central inquiry is whether the same question raised in a subsequent suit was actually litigated and decided in the prior suit, which turns on the determination whether the issue was properly placed in dispute and was resolved by the trier of fact. See Continental Can Company v. Marshall, 603 F.2d 590, 596 (7th Cir.1979). Not only the prior court's decision, but also the pleadings and record in that suit may be considered. See Schoenbrod v. Rosenthal, 36 Ill.App.2d 112, 120, 183 N.E.2d 188, 192 (1962).
 
 
 42
 Judge Schaller's decision notes that several intervening parties opposed to the reorganization alleged that "the reorganization might deprive ratepayers of certain assets previously owned by [the utilities, Peoples Gas and North Shore] and allegedly included in their rate bases." See Peoples Energy Corporation v. Illinois Commerce Commission, Nos. 81 CH 6768 and 81 CH 7199 (consolidated) (Cir.Ct. Cook County) (Findings of Fact, Conclusions of Law, and Order, entered Nov. 19, 1982) (hereafter "State Decision") at 6-7. The counterclaims of Cook County and the City of Chicago also alleged that certain assets previously included in the utilities' rate bases had been improperly transferred to MidCon as a result of the reorganization. State Decision at 8-9. Even after the County and City dropped their counterclaims, Judge Schaller noted that he had denied these parties' motions to exclude evidence pertaining to these issues, "since the counterclaims of other parties continued to present the issues as to the effect of reorganization upon rates, quality of service, and the public interest, and as to whether the reorganization deprived Peoples Gas Light and North Shore of certain assets." State Decision at 8-9. Judge Schaller exhaustively reviewed the history and development of all the companies at issue, beginning with the charter granted by the Illinois legislature to Peoples Gas in 1855, through the reorganization and its effect on rates subsequently charged. Judge Schaller then made specific findings which among other things responded to the claim that assets previously included in the utilities' rate bases were improperly transferred to MidCon. His ultimate and crucial finding was that the reorganization "did not involve the transfer of any of the assets of [the utilities], and none of these assets was transferred to implement the reorganization." State Decision at 72. Moreover, Judge Schaller found that the Illinois Commerce Commission may not lawfully consider the earnings and assets of nonutility businesses in setting rates for utility businesses and neither the dividend payment policy, nor the reinvestment policy, nor the nonutility acquisition program caused any damage to consumers, by adversely affecting either rates or quality of service. Neither the utility subsidiaries nor their consumers had any right to claim benefits in the nonutility investments. State Decision at 77-78. Nor did the reorganization cause the filing of increased rate requests or cause any damage to the utilities or their consumers. State Decision at 77-79. Finally, Judge Schaller concluded that certain intervenors' claims that ratepayers had been deprived of the benefits of certain utility assets had been "specifically refuted" and so no injury had been demonstrated. State Decision at 81.
 
 
 43
 We conclude from the record as a whole that plaintiffs' allegations that rate increases were fraudulently obtained are not different from the issues pertaining to the rate increases decided in the state suit. In essence, plaintiffs are attempting to make their allegations that the rate increases were fraudulently obtained sound different from the issues resolved in the state court suit by arbitrarily separating these allegations from those related to the other events leading up to and including the reorganization. Plaintiffs concede that the dividend payouts, investment program and reorganization were each found to be perfectly proper but say that these events somehow became improper in toto because the funds used to finance these steps were fraudulently obtained through rate increases. But the rate increases, in turn, are only alleged to be fraudulent because the dividend payouts, investment program and reorganization program were later undertaken. We think Judge Schaller's findings that none of the defendants' actions diverted assets from, or in any other way damaged, the utilities, that the earnings and assets of the nonutility subsidiaries were irrelevant to rate determinations and that each of the steps in defendants' alleged scheme to defraud were legal and proper, and did not affect rates, are sufficient to demonstrate that plaintiffs' current focus on the rate increases is unavailing.
 
 
 44
 Plaintiffs make similar arguments in an attempt to show that their allegations that defendants made implicit misrepresentations by failing to disclose their intentions to take the various steps leading to the reorganization are materially different from the issues relating to the propriety of those steps decided in the state court suit. For example, plaintiffs argue that Judge Schaller never explicitly considered whether representations about the dividend payouts were fraudulent. But, as the district court explained, "since the state court reasoned that the dividends were not excessive [defendants' statements that the dividends were not excessive], their truth sustained, cannot in the trial of these cases be found fraudulent by a jury or this court." County of Cook v. MidCon Corporation, 574 F.Supp. at 918. Each of the plaintiffs' general accusations to the effect that defendants misrepresented certain facts suffers from this same sort of defect.
 
 
 45
 Plaintiffs argue that an unfavorable finding in a prior suit concerning an act that formed part of a fraudulent scheme, made without consideration of misrepresentations related to that act or the fraudulent nature of the scheme as a whole, does not collaterally estop relitigation of that part of the scheme in a subsequent suit. See Northern Trust v. Essaness, 103 F.Supp. 954 (N.D.Ill.1952); Harding Co. v. Harding, 352 Ill. 417, 186 N.E. 152 (1933); Schoenbrod v. Rosenthal, 36 Ill.App.2d 112, 183 N.E.2d 188 (1962). Moreover, acts which may be legal or innocent in and of themselves can be part of an activity illegal overall. See, e.g., United States v. Ranney, 719 F.2d 1183, 1187 n. 7 (1st Cir.1983). Further, plaintiffs insist that a duty to disclose material information need not be based on a statute or regulation, but mere concealment of facts from a public body, in order to receive a benefit from that body, may be evidence to support a mail fraud conviction. See United States v. Mandel, 591 F.2d 1347 (4th Cir.), decision after rehearing en banc, 602 F.2d 653 (1979), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).
 
 
 46
 Nevertheless, while plaintiffs' propositions of law are no doubt accurate, they do not advance plaintiffs' argument. First, as explained above, all of plaintiffs' allegations of fraud pertain to defendants' failure to disclose their intentions to take various actions. But given the state court's findings a) that those actions were legal and proper, and b) that neither the public nor the ICC could properly be concerned with those actions and c) that none of the actions caused any injury to the utility companies, the public or the ICC, we do not see on what basis any duty to disclose could arise. Where the prior state court determinations preclude a finding that any component part of the alleged scheme was fraudulent, it is difficult to imagine how the scheme "as a whole" can be fraudulent. Moreover, contrary to plaintiffs' assertions, the state court did consider the "scheme" "as a whole," and concluded that there was no impropriety.[2] In sum, despite plaintiffs' efforts to distinguish the parts in light of the whole, we agree with defendants that the alleged diversion of capital or assets and the component steps of that plan, which are at the core of plaintiffs' RICO charges, were equally important in the state court litigation. Therefore we conclude that the district court's determination that these issues were actually litigated and decided in the state litigation is correct.
 
 
 47
 Plaintiffs also contend that Judge Schaller's findings in the state suit related to the propriety of events up to and including the reorganization should not be given collateral estoppel effect because those findings were not necessary to reach the decision in that case. In particular, plaintiffs stress that the focus of the state suit was the question whether the ICC had jurisdiction over the reorganization, which depended on such issues as whether Peoples Energy was a public utility under Illinois law and whether the reorganization involved transactions between public utilities and affiliated interests. Thus, once Judge Schaller found that the ICC could not assert jurisdiction over the reorganization, findings as to the propriety or effect of such matters as the dividend payouts or acquisition policies were unnecessary to his decision.
 
 
 48
 But Judge Schaller's findings on these matters were made in the course of his consideration of the effect of the reorganization on the public interest, an issue he found necessary to resolve in order to decide whether injunctive relief would be appropriate. Plaintiffs acknowledge the general rule in Illinois to be that a court should not issue an injunction, which is an equitable remedy, without first considering whether the public interest would be adversely affected. See Illinois Housing Development Authority v. Arbor Trails Development, 84 Ill.App.3d 97, 103, 39 Ill.Dec. 506, 510, 404 N.E.2d 1097, 1101 (1980) (preliminary injunction); Biggs v. Health and Hospitals Governing Commission of Cook County, 55 Ill.App.3d 501, 506, 13 Ill.Dec. 123, 127, 370 N.E.2d 1150, 1154 (1977). See also Medtronic Inc. v. Benda, 689 F.2d 645, 649-50 (7th Cir.1982), cert. denied, 459 U.S. 1106, 103 S.Ct. 731, 74 L.Ed.2d 955, 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983). But plaintiffs argue that this rule is inapplicable "where a clear right of [the party seeking the injunction] has been violated." Chicago Br. at 22-23. Apart from the irony inherent in this position (since plaintiffs vigorously contested defendants' right to an injunction in the reorganization litigation) this exception to the general rule is of dubious validity under current Illinois law and certainly is inapplicable in the present case. The older cases on which plaintiffs rely involve a private party's right to enjoin interference with its use of real property. See Barrington Hills Country Club v. Village of Barrington, 357 Ill. 11, 191 N.E. 239 (1934); Rosehill Cemetary Co. v. Chicago, 352 Ill. 11, 185 N.E. 170 (1933). The reasoning in these cases has not been followed in subsequent decisions. See Haack v. Lindsay Light and Chemical, 393 Ill. 367, 66 N.E.2d 391 (1946). See also Village of Wilsonville v. SCA Services, Inc., 86 Ill.2d 1, 28-29, 55 Ill.Dec. 499, 426 N.E.2d 824 (1981); Fink v. Board of Trustees, 71 Ill.App.2d 276, 218 N.E.2d 240 (1966) (stating that Haack overruled Barrington Hills in part). These decisions indicate that the public interest is a factor to be considered even where the rights of the party seeking the injunction have "clearly" been infringed.
 
 
 49
 Most important, as defendants note, it is difficult to imagine a case in which the public interest is more substantially implicated than this one. The effect of the reorganization on gas consumers was the central concern of all parties opposing the reorganization and was vital to Judge Schaller's conclusion that an injunction against interference with that reorganization was appropriate. We reject plaintiffs' additional suggestion, that even if the public interest issue was necessary to the decision whether to grant an injunction, the subsidiary findings concerning rate increases, dividends and investments in nonutility subsidiaries were immaterial to the "real" public interest issue, which was the effect of the reorganization on the public interest in the future. As the district court noted:
 
 
 50
 If Peoples Energy had impaired the capital of its utility subsidiaries through exacting exorbitant, illegal dividends, and diverting those funds to the use of its nonutility subsidiaries, the company and its affiliates clearly would have no standing to seek from a court in equity injunctive relief preventing interference with a reorganization which would have removed assets properly belonging to the utilities beyond the scrutiny of the commission charged with safeguarding the public's interest in such properties.
 
 
 51
 County of Cook v. MidCon Corporation, 574 F.Supp. at 917. Thus we conclude, as did the district court, that the findings made by the state court were necessary to its decision, and therefore are properly given collateral estoppel effect.
 
 
 52
 Finally, we find no merit in plaintiffs' arguments that they were not afforded a full and fair opportunity to litigate the issues relevant to their allegations of a scheme to defraud in the state proceedings. By the time both plaintiffs voluntarily intervened in the state case, the issues relating to the propriety of all parts of the alleged scheme already had been raised by several other intervenors, and were clearly presented in conjunction with Peoples Energy's request for injunctive relief. That the City and County had every opportunity to present evidence on these issues is amply demonstrated by the fact that both parties were permitted to add counterclaims directly raising these issues. Their subsequent withdrawal of these counterclaims, and attempt to limit evidence pertaining to them, does not alter the conclusion that they had a full and fair opportunity to litigate these issues, for two reasons: Most important, as already noted, the issues with respect to which collateral estoppel is asserted were directly relevant to the defendants' request for injunctive relief, with respect to which plaintiffs voluntarily intervened and which they remained in the suit to protest; in addition, plaintiffs' strategic decision not to participate fully in litigating these issues through their counterclaims does not mean they had no full and fair opportunity to do so. "[P]arties cannot manipulate the preclusive effect of state court findings by letting other parties, with whom their interests are aligned, fight the battle for them by presenting all the opposing evidence on certain issues properly raised by the opposing parties." County of Cook v. MidCon Corporation, 574 F.Supp. at 916. See also Continental Can Co., U.S.A. v. Marshall, 603 F.2d 590, 596 (7th Cir.1979).
 
 
 53
 In this respect, it is important to note that the "practical realities" of this case support the application of collateral estoppel principles. See Butler v. Stover Bros. Trucking Company, 546 F.2d 544, 551 (7th Cir.1977); Provident Tradesmens B & T Co. v. Lumbermens Mutual Casualty Co., 411 F.2d 88, 93 (3d Cir.1969). Chicago and Cook County were not dragged into the state proceedings; they voluntarily intervened in them even though many other parties already were vigorously opposing the reorganization. The record is abundantly clear that the court and the parties were aware of the pending RICO claims, and that any public interest findings might well collaterally estop relitigation of those issues in this suit. For this reason, plaintiffs dropped their counterclaims and attempted to exclude all evidence relating to the effect of the reorganization on the public interest. Yet even after the court had denied their motion in limine, they chose to remain in the suit as full parties defendant, knowing full well that the issues relating to the public interest would be litigated and decided in conjunction both with Peoples Energy's request for injunctive relief and with the other intervenors' counterclaims. For these and other reasons, we find no inequity in the conclusion that collateral estoppel operates to bar relitigation of issues that were decided in the state suit and are controlling in this one.[3]
 
 IV.
 
 54
 We have determined that Illinois collateral estoppel principles would bar relitigation of issues which control plaintiffs' claim that there was a scheme to defraud, cognizable under the mail fraud statute and hence under RICO. We must now decide whether RICO explicitly or implicitly creates an exception to 28 U.S.C. Sec. 1738 so that state preclusion law is not determinative. In several recent cases in which parties alleged that a particular statute limited the ordinary effect of the full faith and credit provision, the Supreme Court has failed to find any implied repeal. See Kremer v. Chemical Construction Corporation, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (no partial repeal of 28 U.S.C. Sec. 1738 in Title VII); Allen v. McCurry, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (no repeal of 28 U.S.C. Sec. 1738 in Sec. 1983 actions). Cf. Marrese v. American Academy of Orthopaedic Surgeons, --- U.S. ----, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (refusing to consider whether exclusively federal antitrust laws create exception to section 1738 in absence of prior determination of preclusive effect under state law).[4] In Kremer, the Court discussed the standards governing the determination whether an exception to section 1738 should be found in the operation of a subsequently enacted statute. Kremer v. Chemical Construction Corporation, 456 U.S. at 468, 102 S.Ct. at 1890. First, no exception will be recognized unless the more recent statute contains an express or implied partial repeal. In the absence of an express repeal, an implied repeal would have to be found, but repeals by implication are not favored. Two well-settled categories of repeal by implication exist: (1) where provisions in the two acts are in irreconcilable conflict, so that to the extent of the conflict the later act partially repeals the earlier one, and (2) where the later act covers the whole subject of the earlier one, so that the later act completely repeals the earlier act. In either case, "the intention of the legislature to repeal must be clear and manifest." Id., citing Radzanower v. Touche Ross and Company, 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (quoting Posadas v. National City Bank, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)).
 
 
 55
 Certainly there is nothing in the language of RICO to suggest that Congress explicitly repealed section 1738 or limited its effect in cases involving RICO claims.[5] Section 1964(d) specifically provides that a judgment rendered in favor of the United States in a criminal proceeding brought under RICO's criminal provisions shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceedings brought by the United States. That section does not deal with the collateral estoppel effects of a judgment in a previous criminal case not rendered in favor of the United States, or of a previous judgment in a federal civil case or of a state court judgment in a criminal or civil case. Presumably these matters were left to resolution by courts applying traditional rules of res judicata (including issue preclusion), which is "very much a common law subject." See WRIGHT AND MILLER AND COOPER, FEDERAL PRACTICE AND PROCEDURE, Sec. 4403 at 19.[6] In any event, the statutory language certainly does not provide any reason to believe that any part of RICO was intended to modify or supersede the provision in section 1738 that federal courts are to apply state preclusion law in determining the effect of state court decisions. Even more certainly there is no "irreconcilable conflict" between the provisions of the two statutes.
 
 
 56
 Nor is there any indication in RICO's legislative history that Congress ever considered the question whether the effect of section 1738 should in some way be limited or modified when the preclusive effect of state court decisions on subsequent RICO civil claims was at issue. Generally, of course, Congress was aware that in enacting RICO it was affecting the interplay between federal and state roles in fighting organized crime by criminalizing conduct that previously had been exclusively subject to the states' police power, see United States v. Turkette, 452 U.S. 576, 586-87, 101 S.Ct. 2524, 2530, 69 L.Ed.2d 246 (1981). But, in this respect, Congress was merely "adding to the jurisdiction of the federal court, not subtracting from that of the state courts." Allen v. McCurry, 449 U.S. at 99, 101 S.Ct. at 417.[7] Moreover, the fact that Congress enacted a new comprehensive federal scheme in response to the perceived inadequacy of existing state and federal law, see United States v. Turkette, 452 U.S. at 586, 101 S.Ct. at 2530, is in no way inconsistent with traditional doctrines of preclusion. See Kremer v. Chemical Construction Corporation, 456 U.S. at 472 n. 10, 476-77, 102 S.Ct. at 1892 n. 10, 1894-95; Allen v. McCurry, 449 U.S. at 98-99, 101 S.Ct. at 416-17. Indeed, Title VII, which contemplates de novo review of Title VII claims even after facts underlying such claims have been considered in state administrative proceedings, see Kremer, 456 U.S. at 469, 470 n. 7, 102 S.Ct. at 1891 n. 7; but see Buckhalter v. Pepsi-Cola General Bottlers, Inc., 768 F.2d 842 (7th Cir.1985), nevertheless does not clearly imply an intent to supersede section 1738 with respect to state court judgments rendered in deference to such proceedings, see Kremer v. Chemical Construction Corportion, 456 at 461, 102 S.Ct. at 1883. On that basis, it is much more difficult to imagine how RICO which is not concerned with the inadequacy of state courts in protecting federal rights, can be thought to implicitly repeal section 1738.
 
 
 57
 We believe that our determination that neither RICO's language nor its legislative history clearly manifests an intention to depart from section 1738 is sufficient to conclude this issue. In addition, applying section 1738 in the RICO context does not appear to undermine the federal policies served by RICO. As noted, RICO was enacted in response to the perceived inadequacy of existing state and federal laws to deal with the nationwide problem of organized crime, and its civil provisions in particular were designed to deprive enterprises which had engaged in prohibited acts of the fruits of their ill-gotten gains. See United States v. Turkette, 452 U.S. at 585, 101 S.Ct at 2529. This sort of goal is substantially different in terms of its implications for application of state preclusion rules than are the goals served by a statute like Title VII, one of which was clearly to overcome the inadequacy of the state courts' protection of fair employment rights. With Title VII, a stronger argument can be made that giving preclusive effect to determinations of state courts would significantly undermine the effort to provide a consistent and steadfast system for remedying violations of federal law. But giving preclusive effect under state law to state court decisions rendered prior to a criminal prosecution or civil case under RICO seems, if anything, to advance rather than to detract from RICO's goals.
 
 
 58
 Where violations of state law are used as predicate offenses under RICO, for example, applying state preclusion principles to bar relitigation of issues necessarily decided by a state determination of criminal liability would materially advance the federal proceedings. This would have the same positive effect as giving preclusive effect to a judgment in favor of the government in prior federal prosecutions under section 1964(d).[8] On the other hand, a finding of not guilty in a prior state prosecution would not necessarily preclude a party from attempting to establish the existence in a civil action of a predicate act based on the same conduct, since it is apparently not clear that predicate acts must be established beyond a reasonable doubt in a civil suit under RICO as they must be in state criminal prosecutions. See Sedima, S.P.R.L. v. Imrex Company, Inc., --- U.S. ----, 105 S.Ct. 3275, 3283, 87 L.Ed.2d ---- (1985). And, even if the standards were the same so that the determinations made in state court were identical to those at issue in the civil RICO case, we see no detriment to the policies underlying RICO in precluding relitigation of those issues if preclusion is appropriate under state law. RICO's civil provisions are designed to divest an enterprise only of ill-gotten gains; where a state court determines that no violation of state criminal law has occurred (a decision state courts are particularly competent to make), the federal government has no legitimate interest in allowing that innocent conduct to be used to support civil liability.
 
 
 59
 Most important, we believe the requirement that a party must have had a "full and fair opportunity" to litigate the same issue in a prior suit before he can be collaterally estopped from litigating those issues in a subsequent suit will sufficiently protect the federal interests at stake. Where, for example, only some aspects of an allegedly fraudulent scheme were at issue in the prior suit, a subsequent RICO action based on the entire scheme presumably would not be barred. Or where it appears that actions that were determined to be proper under state law may still be considered part of a scheme to defraud, for example if they appear deceptive and inconsistent with fair and upright dealing, the issues decided in the state suit may not preclude subsequent litigation of the underlying facts under RICO standards. Only in the relatively unusual case such as the one before us, in which all significant aspects of an alleged scheme to defraud were previously litigated thoroughly and found to be proper under state law, and such findings are necessarily inconsistent with the hypothesis that there has been a violation of RICO standards, will the prior state court determinations collaterally estop issues controlling in a subsequent RICO suit. In such a circumstance we can discern no substantial federal policy that would be served by allowing relitigation of previously decided issues.[9] For these reasons we conclude that it would be inappropriate to imply an exception in RICO suits to the traditional rule under section 1738 that the preclusive effect of a state court adjudication is to be determined by reference to the law of the rendering state.
 
 V.
 
 60
 We have concluded that the district court correctly ruled that Illinois collateral estoppel principles operate to bar relitigation of issues controlling in this RICO suit[10] and that there is no reason to imply an exception under RICO to the full faith and credit statute so that Illinois preclusion rules would not apply. We therefore AFFIRM the district court's determination that plaintiffs' RICO claims should be dismissed."[11]
 
 
 
 [1]
 See infra n. 4
 
 
 [2]
 We do not mean to imply that state law standards are identical to, or control the determination of, federal standards under RICO. Rather, our discussion is only intended to demonstrate that the factual issues decided in the state court suit are material and controlling in plaintiffs' current suit alleging a scheme to defraud. Plaintiffs cite us to United States v. Mandel, 591 F.2d at 1361, where the court said that "the mail fraud statute generally has been available to prosecute a scheme involving deception that employs the mails in its execution that is contrary to public policy and conflicts with accepted standards of moral uprightness, fundamental honesty, fair play and right dealing." But the point that escapes plaintiffs is that the actual findings made in state court preclude a determination that defendants' activities fall under even that broad definition of fraudulent conduct. We agree that in some circumstances actions may be found fraudulent even if they do not in terms transgress any statute. For example, in Mandel, allegations that a governor accepted bribes in return for adopting favorable positions on certain legislation could constitute a scheme to defraud even though the governor clearly had the right to take, and previously had adopted, those positions as a matter of independent judgment. There it was obvious that the governor's failure to disclose that his judgment was no longer independent was utterly inconsistent with "fair play and right dealing." But a duty to disclose must arise from somewhere. If no state law is violated, and the circumstances of defendants' actions do not by themselves raise an inference of deception, self-dealing or even of any damage to the supposed victims of the scheme to defraud, then plaintiffs must point to some other basis for believing that the actions constituting the scheme were in fact fraudulent. Otherwise, the previous findings that defendants' actions were legal and proper are sufficient to conclude the issue. See 1B MOORE'S FEDERAL PRACTICE p 0.443 at 761 ("Any contention that is necessarily inconsistent with a prior adjudication of a material and litigated issue, then, is subsumed in that issue and precluded by the prior judgment's collateral estoppel effect.")
 
 
 [3]
 Both plaintiffs also argue they had no full and fair opportunity to litigate their RICO claims in state court, based on their contention that jurisdiction over RICO claims is exclusively federal. We have concluded that under Illinois law the doctrine of collateral estoppel fully applies to bar relitigation of the issues presented in this suit. Therefore we find it more appropriate to consider plaintiffs' arguments regarding the interplay between state and federal claims in conjunction with our decision whether RICO creates an exception to the usual rule that a federal court must look to state preclusion law in evaluating the effect of prior state proceedings on a subsequent federal claim
 
 
 [4]
 No federal appellate court has yet considered the question whether jurisdiction over RICO claims is exclusively federal. Two district courts have determined that state courts enjoy concurrent jurisdiction of RICO claims. See Chas. Kurz Co. v. Lombardi, 595 F.Supp. 373, 381 n. 11 (E.D.Pa.1984) (stating that there is no indication that Congress intended RICO jurisdiction to be exclusively federal); Luebke v. Marine National Bank of Neenah, 567 F.Supp. 1460, 1462 (E.D.Wis.1983) (stating that a presumption of concurrent jurisdiction controls unless Congress explicity provides to the contrary). On the other hand, two state courts (in addition to the court below) have reached the opposite conclusion. See Greenview Trading Co. v. Hershman & Leicher, P.C., 108 A.D.2d 468, 489 N.Y.S.2d 502 (1985) (relying primarily on Congress' modeling of RICO provisions on antitrust statutes, which are exclusively federal); LaVay Corporation v. First National Bank of Maryland, No. 83-1020 (Circuit Court Prince Georges County, Maryland) (same). We doubt whether the analogy to antitrust law is sufficiently strong to conclude that because jurisdiction over antitrust cases is exclusively federal, RICO jurisdiction necessarily must follow suit. See Sedima, S.P.R.L. v. Imrex Co., Inc., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); Schacht v. Brown, 711 F.2d 1343, 1358 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 508, 509, 78 L.Ed.2d 698 (1983). Particularly in light of the normal presumption that state courts share concurrent jurisdiction over federal statutes, we would be reluctant to conclude from congressional silence that Congress intended to depart from the usual rule. Cf. Greenview Trading Co. v. Hershman & Leicher, P.C., 108 A.D.2d 468, 489 N.Y.S.2d 502 (court quotes "principal draftsman of RICO," Professor G. Robert Blakey, for the proposition that there is nothing on the face of the statute or in the legislative history that touches on the question of concurrent jurisdiction, although if Congress had considered the question, it would have made jurisdiction exclusively federal). In any event, we do not find it necessary to decide the issue today. It would be particularly ironic for us to find exclusive federal jurisdiction in a case involving the operations of state-regulated public utilities, which would seem to be in a special way the concern of state law. See Kremer v. Chemical Construction Corporation, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982) (refusing to reach the issue whether jurisdiction over Title VII is exclusively federal in the course of deciding whether Title VII creates an exception to section 1738)
 
 
 [5]
 Cf. Wright and Miller and Cooper, Federal Practice and Procedure, Sec. 4403 at 19, n. 20 (discussing statutes that expressly provide for, or defeat, ordinary rules of res judicata)
 
 
 [6]
 Possibly an argument could be made that by omitting any discussion of the use of collateral estoppel in situations other than a civil proceeding brought by the United States following a criminal proceeding brought under RICO by the United States, Congress intended to express its intention that traditional collateral estoppel principles would not apply in these other circumstances. Certainly, we would be reluctant to find in the legislature's mere failure to provide for these other situations any "clear and manifest" intention to repeal section 1738. Indeed, Professor Blakey, who served as Chief Counsel of the Senate Subcommittee on Criminal Laws and Procedures during 1969 and 1970, when the Organized Crime Control Act was considered, has indicated that the legislature's omission of any reference to the use of collateral estoppel by private parties following a criminal conviction secured by the United States
 was not the result of a policy decision to bar private parties' use of collateral estoppel, but rather of an understanding of the requirements of mutuality at the time RICO was drafted. When the subsequent civil action is brought by a private individual, the preclusion effect of the prior criminal prosecution would be governed not by RICO, but by general principles.
 .... Consequently ... it seems clear that a third party will be permitted to make use of a prior verdict in a criminal prosecution against the defendant in a subsequent civil action under RICO.
 G. ROBERT BLAKEY AND BRIAN GETTINGS, RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO): BASIC CONCEPTS--CRIMINAL AND CIVIL REMEDIES, 53 TEMPLE L.Q. 1009, 1045-46 (1980) (footnotes omitted). See also 2 CORNELL INSTITUTE ON ORGANIZED CRIME, MATERIALS ON RICO 859-93 (1980-81). Of course, Professor Blakey's comments do not address the particular situation at issue in this case--the use of collateral estoppel in a civil RICO suit to preclude relitigation of issues decided in a prior state civil case. It seems, if anything, less likely that Congress would intend to supersede traditional preclusion principles in this situation than in the criminal/subsequent private-party civil RICO action context, which presumably was more easily foreseeable. Regardless, the central inquiry is whether there is any clear indication that Congress intended to repeal section 1738 when it enacted RICO, and Professor Blakey's view lends support to our conclusion that it did not.
 
 
 [7]
 See United States v. Turkette, 452 U.S. at 586 n. 9, 101 S.Ct. at 2530 n. 9:
 RICO imposes no restrictions upon the criminal justice system of the States. See 84 Stat. 947 ('Nothing in this title shall supersede any provision of Federal, State, or other law imposing criminal penalties or affording civil remedies in addition to those provided for in this title'). Thus, under RICO, the States remain free to exercise their police powers to the fullest constitutional extent in defining and prosecuting crimes within their respective jurisdictions. That some of these crimes may also constitute predicate acts of racketeering under RICO, is no restriction on the separate administration of criminal justice by the states.
 
 
 [8]
 Indeed, denying issue preclusive effect to prior state convictions for offenses that may serve as predicate offenses under RICO would seem nonsensical in light of the fact that a civil action may be brought on the basis of predicate acts, involving certain conduct that is merely "chargeable" under state law, without the necessity of a prior conviction for violation of the state law. See Sedima, S.P.R.L. v. Imrex Company, Inc., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346. It would seem anomalous to require a court presiding over a civil RICO action to determine whether the defendant could be convicted of violating state law while refraining from relying on the fact that he had already in fact been convicted of such a violation
 
 
 [9]
 Without discussing whether an exception to Sec. 1738 should be recognized, the court in Greenblatt v. Drexel Burnham Lambert, Inc., 763 F.2d 1352 (11th Cir.1985) applied collateral estoppel principles to preclude a civil RICO claim primarily on the basis of issues decided against the plaintiff in a prior arbitration of state contract claims. See also Sports Factory, Inc. v. Chanoff, 586 F.Supp. 342, 347-48 (E.D.Pa.1984) (res judicata barred relitigation of issues in civil RICO suit that were or could have been decided in prior arbitration)
 
 
 [10]
 In light of our determination that the district court correctly dismissed this suit on grounds of collateral estoppel, we need not review its holding that the RICO claims were not barred by res judicata
 We do affirm the district court's holding that res judicata bars plaintiffs' pendent claims, which seek to impose an accounting and constructive trust on the corporations and their officers for breach of their fiduciary duties under state law. (The district court only referred explicitly to the state law claims urged by the City, although the County had apparently brought similar claims; the County has not raised this issue in its briefs on appeal, but since the same rationale applies to both parties' state claims, we treat them together.) The City correctly notes that Illinois has a permissive counterclaim rule, and that generally, absent a compulsory counterclaim rule, when facts form the basis of both a defense and a counterclaim in an initial action, the original defendant's failure to allege these facts as a defense or counterclaim does not normally preclude him from relying on those facts in a subsequent action brought by him against the original plaintiff. See RESTATEMENT OF JUDGMENTS, Sec. 22(1) and comment b. An exception to this rule is recognized, however, where the relationship between the potential counterclaim and the plaintiff's claim in the first suit "is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." RESTATEMENT OF JUDGMENTS, Sec. 22(2)(b) and comment f; Lee v. City of Peoria, 685 F.2d 196, 201 (7th Cir.1983); Martino v. McDonalds System, Inc., 598 F.2d 1079 (7th Cir.), cert. denied, 444 U.S. 966, 100 S.Ct. 455, 62 L.Ed.2d 379 (1979). We believe the rationale of the exception noted in the Restatement and recognized in Lee and Martino is fully applicable to the state claims urged here which, as the district court noted, in many respects duplicate the counterclaims that plaintiffs voluntarily withdrew from the state proceedings. We agree with the district court's conclusion that:
 [If the City and County] were granted the relief that is requested of this court, rights established in favor of the corporate defendants by the judgment of the state court would clearly be impaired. Moreover, since the City and County chose to intervene with state proceedings, this is not the usual instance where defendants, having been sued, were involuntarily forced to litigate in the prior forum so that equities counsel that they be given the opportunity to raise their own claims in a forum of their choice. The traditional considerations associated with res judicata, therefore, are fully applicable to the City and County.
 County of Cook v. MidCon Corp., 574 F.Supp. at 909 n. 1.
 
 
 [11]
 Plaintiffs contend that the district court erred by dismissing plaintiffs' RICO claims on the basis that they had made no allegations of a separate "racketeering injury" distinct from injuries arising from the predicate acts. We note that the Supreme Court recently decided that no such "racketeering injury" requirement exists. Sedima, S.P.R.L. v. Imrex Company, Inc., --- U.S. ----, 105 S.Ct. 3275, 87 L.Ed.2d 346; American National Bank & Trust Company v. Haroco, Inc., --- U.S. ----, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). However any error in the district court's analysis of this point is without effect since we have approved its alternative, independent rationale for dismissal based on collateral estoppel