**HMK CORPORATION, a Virginia Corporation, Plaintiff,**

v.

**John C. WALSEY, et al., Defendants.**

**Civ. A. No. 86–0012–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

June 9, 1986.

James C. Harrison, Marks, Stokes & Harrison, Hopewell, Va., for plaintiff.

Charles F. Witthoefft, Hirschler, Fleischer, Weinberg, Cox & Allen, Edward E. Willey, Jr., Willey & Hall, P.C., Richmond, Va., Steven L. Micas, Co. Atty., Jeffrey L. Mincks, Sr., Asst. Co. Atty., Gary G. Patterson, Asst. Co. Atty., Chesterfield, Va., James T. Moore, III and John J. Beall, Jr., Sr. Asst. Attys. Gen., Richmond, Va., for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter comes before the Court on the following motions: (1) the motion to dismiss or, in the alternative, for summary judgment on behalf of defendants Hedrick, Balderson, and Jane or John Does 11–20; (2) the motion to dismiss or, in the alternative, for summary judgment on behalf of defendants Walsey, Blumberg, Sigma CJ, Petula Associates, and Jane or John Does 1–10; (3) the motion to dismiss of King and Hodge; (4) the motion to dismiss on behalf of Jane or John Does 21–30; and (5) plaintiff's motion for a preliminary injunction. The Court GRANTS defendants' motions on two theories, holding that principles of collateral estoppel and *res judicata*, along with the statute of limitations, bar plaintiff's action.

## I. FACTS:

Although the parties have filed voluminous briefs and exhibits detailing the history of this case, the Court finds the case extraordinarily simple. Two developers have crossed swords over a unified section of land so that advantages given one hamper the aspirations of the other. One party, HMK Corporation, sees fraud at every turn, and commences lawsuits at the drop of a hat.

The land in question is the Jahnke-Chippenham Development Area ("JDCA"). This area is bordered on the east by the Chippenham Parkway and on the south by the Midlothian Turnpike. It is bisected by Jahnke Road and by a proposed extension of the Powhite Parkway. The two developers are HMK Corporation ("HMK") and a series of companies and partnerships called, for the purposes of this suit, the "Boulders Developers." ("Boulders").[1]

The Court cannot do justice to the fine detail with which the parties have described the facts and will not even attempt to recite the chronology of events. Essentially, this suit boils down to three basic contentions: (1) that the defendants conspired to grant the zoning requests of Boulders while denying zoning to HMK; (2) that defendants attempted, and are still attempting, to condemn HMK's property for the private use of Boulders; and (3) that defendants are forcing HMK to donate land for the Powhite Parkway and to pay for the collector-distributor roads proposed by HMK. Admittedly, there are allegations that do not fit into these categories and that concern more recent events. However, these later events are peripheral to the main dispute.[2]

---

**1.** The Boulders developers include (1) B.J. Associates; (2) B.J. Properties of Virginia, Inc.; (3) S.P.B. & Associates, Inc.; (4) Sigma Realty, Inc.; (5) Sigma CJ Associates; (6) Sigma Development, Inc; (7) the Boulders; (8) Petula Associates Ltd., Inc.; (9) Chinaberry Associates; (10) Flintridge Station Associates; (11) Forge-O'Connell Properties IV; and (12) Boulders Investors.

The only Boulders developers actually named in this suit are: (1) Sigma C.J. Associates; (2) Petula Associates, Ltd.; and (3) Jane or John Does 1–10.

**2.** HMK challenges as well (1) the occupation of the Pru-Care building in the Boulders' development and (2) the Board's zoning decisions on Boulders' Fidelity Building. It perceives these events as part of a more recent "lesser fraud" by defendants Balderson, Hedrick, and Boulders to circumvent the zoning conditions placed on Boulders. Appendix F to Complaint at 120.

The Pru-Care building lies within the Boulders' property that was rezoned on July 27, 1983. As a condition of that rezoning, Boulders was required to make certain road improvements, and until it completed these, occupancy permits were not to be issued. In September of 1984, VDH & T confirmed that Boulders had constructed the necessary improvements. Although some items still had to be finished before the road become part of the secondary

(a) *Zoning decisions favoring Boulders:*

In 1982 and 1983, the Chesterfield County Board of Supervisors made a series of zoning decisions concerning the properties of HMK and Boulders. HMK contends that these decisions were the product of a conspiracy involving Boulders, and members of the County Planning Department and the Virginia Department of Highways and Transportation ("VDH & T"). The purpose of the conspiracy was to favor Boulders so that it could intensively develop its property, while HMK remained severely limited in its development. As a result of these decisions, HMK allegedly entered the market two years after Boulders.

The first cluster of zoning decisions concerned the "Call tract," a 135–acre parcel owned by Boulders that lies between Jahnke Road and the Midlothian Turnpike. In May of 1982, Boulders requested that this area be rezoned from agriculture to planned development. The Board of Supervisors approved this rezoning, after several alterations of the plans, in October 1982. Boulders' proposal, as finally approved, provided for direct access from the tract onto Chippenham Parkway by way of a "flyover" road.

In January 1983, the Virginia Department of Highways and Transportation ("VDH & T") notified the County that it would not approve Boulders' flyover concept and that it would only approve an access plan for the project utilizing an at-grade intersection of Chinaberry Drive and Jahnke Road. This plan would require an extension of Chinaberry Drive from the Call tract to Jahnke Road. The extension would cut across the property of HMK. Because of VDH & T's objections, Boulders subsequently amended its proposal for the Call tract to eliminate the flyover and to substitute in its place an extension of Chinaberry Drive. The Board approved this amendment on July 27, 1983.

The second zoning decision concerned "Sigma II," an 85–acre parcel owned by Boulders that bordered on the southern boundary of the Call tract. In June 1983, Boulders filed a rezoning application that included 285 multi-family dwelling units and 200,000 square feet of office space. The Board of Supervisors approved this request on November 23, 1983, but imposed

---

system of the Virginia highways, the roads were functional. Accordingly, on March 6, 1985, the County issued a temporary occupancy permit for the Pru-Care building. HMK challenges the occupation of the building and perceives this as yet another instance of fraud.

The Fidelity Building is also on the Boulders' property that was rezoned in July 1983. When Boulders applied in 1984 for a building permit, the square footage of this building put Boulders above the maximum area of office space it could construct. Accordingly, the County denied the application, directing Boulders to file an amended building permit application with reduced square footages. The County then rejected the amended form because Boulders had not calculated the square footages in the manner the County required. Boulders' next application was approved. Along with that application, however, Boulders filed for a zoning amendment to revise the square footage limitation imposed by the Board. Boulders' purpose was to obtain approval of the Fidelity Building at its originally submitted size. Not surprisingly, HMK objected to this zoning petition. The Board of Supervisors eventually approved the request on March 27, 1985, subject to additional restrictions concerning construction schedules and financial sureties for road improvements.

Pursuant to the new rezoning, Boulders applied for, and received, a new building permit for construction of the previously-deleted footage.

HMK filed suit in state court on these issues but non-suited both actions prior to filing the present suit. These allegations are not barred by either the statute of limitations or *res judicata*. They do not, however, standing on their own constitute a "pattern of racketeering activity" under RICO. Hence, these do not support a RICO claim. More than two related acts are necessary to form a pattern. *Torwest DBC, Inc. v. Dick,* 628 F.Supp. 163 (D.Colo.1986); *Fleet Management Systems v. Archer-Daniels-Midland Co.,* 627 F.Supp. 550 (C.D.Ill.1986); *Northern Trust Bank/O'Hare, N.A. v. Inryco,* 615 F.Supp. 828 (N.D.Ill.1985). The Court is of the opinion that the entire course of conduct between HMK and the defendants does not constitute a RICO pattern. These two incidents are part of only a single episode, in which HMK protests County zoning in favor of Boulders. This does not constitute a RICO pattern, as the necessary "continuity plus relationship" is lacking. *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Standing on their own, these allegations demonstrate only isolated behavior, which, at most, is part of only a single fraudulent scheme.

several conditions, including one requiring the construction of an extension of Chinaberry Drive to Jahnke Road. Again, this extension would cut across HMK property.

During this period, HMK was submitting its own plans, which led to the third set of decisions. In October 1982, HMK filed an application to rezone a tract of land north of Jahnke Road from Agricultural to "B–3." HMK sought unconditional zoning that would have allowed HMK to build, virtually without restriction, a host of intensive commercial and retail uses. Due to the unplanned nature of the application, the County's planning staff suggested to HMK that it withdraw the application and refile after further consideration. Shortly thereafter, HMK voluntarily withdrew its application.

Later, in June of 1983, HMK filed another application, this time to rezone its property from agricultural to Conditional Use Planned Development ("CUPD"). This application postdated the Boulders applications for the Call tract and Sigma II. In November 1983, the Board of Supervisors denied HMK's application. The Board had received complaints from citizens about the density of the project, and on the basis of those complaints, had requested that HMK limit the type, density and location of commercial uses adjacent to the established neighborhoods north of the Powhite Parkway. HMK refused to compromise its commercial plans to the north.

The final Board decision in this series concerned the adoption of an amendment to its "General Plan 2000." Because of the developments proposed by both Boulders and HMK, the County had contracted with a consultant to analyze land-use and traffic flow in the JDCA. The end result was a General Plan Amendment that proposed a transition of land uses proceeding northwards from the Midlothian Turnpike. This amendment would limit in particular the development of HMK's property. However, the proposed plan stipulated that if HMK constructed a direct access to an adjacent limited access highway (such as the proposed Powhite Extension), the General Plan could be modified to permit more intensive use of the HMK tract north of Powhite.[3] The amendment to the General Plan was adopted by the Board of Supervisors on July 27, 1983.

(b) *Condemnation of HMK property:*

As the zoning decisions above highlight, an extension of Chinaberry Drive across HMK property is required to service the properties south of Jahnke Road. Accordingly, the .VDH & T has implemented quick-take procedures under Va.Code § 33.-1–89 *et seq.* to acquire the property. Under § 33.1–122, plaintiff has been divested of its title to the property, and the Commonwealth has obtained a defeasible title. The County will not gain an indefeasible title to this property until condemnation procedures are completed with a favorable ruling for the Commonwealth. No final decision by the state courts has yet been made.

(c) *Powhite Extension and Collector-Distributor System:*

The final chapter in this saga is HMK's claim that it is being forced to pay for the collector-distributor system on the Powhite extension. Sometime prior to June 20, 1983, HMK had notified the County that it wished to have certain design changes made to the Powhite extension plans. These modifications would accommodate a collector-distributor road network serving HMK's development. HMK's intent, apparently, was to propose this system as an alternative to the extension of Chinaberry Drive. If successful, HMK would have preserved its property lying between the Call tract and Jahnke Road and would have been able to share the cost of the collector-distributor network with Boulders. Instead, HMK claims, the defendants delayed the consideration of this proposal so that the County never seriously considered it as an alternative to Chinaberry Drive. Thus, while the collector-distributor system has

---

**3.** In fact, this later modification did occur. On October 23, 1985, the Board of Supervisors approved the 1985 JCDA General Plan amendment, which accomodates the HMK proposal.

now been approved by the VDH & T, it serves HMK's development primarily, and HMK must bear most of the cost.

HMK alleges numerous delaying tactics on the part of the defendants, among them the County's refusal to submit HMK's proposal for the system to the consultant working on the amendment to the General Plan 2000. These "delaying tactics" apparently culminated with HMK's dispute with the County over submitting the proposal to the VDH & T. The VDH & T had notified the County on June 20, 1983 that it would consider proposals by private developers for modifications of the Powhite extension. It required, though, that the private developer pay for the costs of preparing the changes in engineering design. In addition, it required that the proposals be submitted by the private developer via the County administration.

In accordance with the VDH & T's requirements, the County sent a contract to HMK providing the conditions for forwarding the plans to VDH & T. Certain of the contract provisions HMK challenged as being unconstitutional conditions. HMK filed suit in federal court on these grounds and prevailed. *See HMK Corporation v. County of Chesterfield,* C/A 84–0170 (E.D. Va., August 9, 1984) (Warriner, J.). Since that time, the VDH & T has entered into a contract with the County to incorporate the designs of HMK and has hired a consultant to engineer these designs. However, because of the dispute over the contract, HMK's submitted its proposals to VDH & T almost a year after HMK originally provided them to the County.

## II. THE EFFECT OF PRIOR LAW SUITS:

Prior to the present law suit, HMK filed a series of suits in both federal and state court. The preclusive effect of these suits now eliminates much of plaintiff's present suit. The present suit challenges the activities related above and contains seven counts. Counts I–IV allege various RICO violations. Count V charges the County and State defendants with a violation of 42 U.S.C. § 1983. Count VI charges common law fraud and Count VII charges a violation of Virginia's business conspiracy act, Va.Code § 18.2–500.

█ In examining the preclusive effect of the prior suits on these present claims, the Court will limit its analysis to the alleged RICO violations. The § 1983 claim is so vague that the Court cannot determine whether or not it is barred. Although the claim probably is barred, the Court dismisses it without prejudice and grants plaintiff leave to refile it with greater specificity, should it be so advised. The pendent state law claims require no discussion. The Court in its discretion dismisses these without prejudice. *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).[4]

In litigating these events, plaintiff elected a piecemeal approach. It first filed a series of state suits challenging the 1982–83 zoning decisions, all of which were later consolidated. It then filed a federal suit challenging the conditions the County imposed on HMK in return for submitting HMK's collector-distributor system to VDH & T. Finally, it filed suit, again in federal court, alleging an unlawful conspiracy to take its property for the extension of Chinaberry Drive. Having elected to sue on some of the underlying events, HMK is now bound by the findings in the prior suits on those matters.[5]

---

4. The defendants have moved for the Court to dismiss defendants Jane and John Does 1–30. Generally, John Doe suits are permissible only against "real, but unidentified, defendants." *See Schiff v. Kennedy,* 691 F.2d 196, 197 (4th Cir. 1982). If "it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention of the court," then the court can dismiss the action. *Id.* at 198. In this case, the plaintiff has had more than adequate time to discover the identities of these parties, if they do in fact exist. Accordingly, the Court dismisses the action as to Jane and John Does 1–30 without prejudice.

5. The case law abounds with decisions under RICO granting preclusive effect to prior judgments. *See, e.g., County of Cook v. Midcon Corp.,* 773 F.2d 892 (7th Cir.1985) (prior state judgments); *Greenblatt v. Drexel Burnham Lam-*

HMK's prior three lawsuits track the three broad categories of events described above. Since the preclusive effect of each varies, the Court will analyze them each in turn.

(a) *Zoning decisions favoring Boulders:*

■ HMK filed five suits in the Chesterfield Circuit Court challenging the validity of all of the 1982–83 zoning decisions described above. Judge Gates consolidated these suits with one filed by two individual property owners and considered the validity of the zoning decisions as a whole.

The issues as framed at trial were:

(1) the validity of the rezoning decisions concerning the Call tract made by the Board on October 27, 1982 and July 27, 1983;

(2) the validity of the amendment to the General Plan 2000 approved by the Board on July 27, 1983;

(3) the validity of the rezoning decisions concerning the Sigma II parcel made by the Board on November 23, 1983;

(4) the validity of the rezoning decision concerning the HMK tract made by the Board on November 23, 1983.

As can be seen, HMK was attacking the zoning decisions that it now challenges here.

In a letter-opinion dated June 20, 1984, Judge Gates found all of these decisions valid. He held that defendants had offered "substantial evidence of reasonableness" in support of the rezoning of the Call tract and Sigma II and the amendment to the General Plan. He further found that the evidence showing the unreasonableness of HMK's rezoning proposal was substantial and supported the denial by the Board of Supervisors.

In addition, the Court remarked on HMK's allegations of fraud:

"Plaintiff, throughout this litigation, has intimated that the Board of Supervisors conspired to favor one developer over another. This is a controversy between developers who own property adjacent to Chippenham Parkway, a limited access highway. The Court has allowed liberal and exhaustive pre-trial discovery. The evidence at trial failed to show any impropriety and partiality by the Board in rendering its decision."

HMK appealed to the Supreme Court of Virginia but its certification for appeal was denied on December 5, 1985.

Even ignoring the technical rules of preclusion, the Court finds that these state court rulings bar the present suit. Common sense dictates that HMK has no further remedy if the zoning decisions are themselves valid and supported by substantial evidence. The zoning decisions alone were the cause of any damage that HMK suffered. Thus, if they are found valid, they purify any possible fraud that may have preceded.

In this respect, the Court notes with approval the Virginia law embodied in *Board of Supervisors v. Jackson,* 221 Va. 328, 269 S.E.2d 381 (1980) and *Blankenship v. City of Richmond,* 188 Va. 97, 49 S.E.2d 321 (1948). These cases forbid the admission of evidence on the motive of legislators when a party challenges the validity of legislation. As long as the legislative decision is "fairly debatable" in view of the evidence presented, it is valid. In limiting the evidence in this manner, Virginia prevents end-runs on the legislative process. It recognizes the reality that probably all legislative decisions involve a certain amount of compromise, and it prevents litigants from rummaging through these compromises whenever they are dissatisfied

*bert, Inc.,* 763 F.2d 1352 (11th Cir.1985) (prior findings of arbitration panel); *Hotel Corp. of South v. Rampart,* 46 B.R. 758 (D.C.La.1985), aff'd, 781 F.2d 901 (5th Cir.1986) (prior adversary proceeding in bankruptcy). In fact, courts permit the use of offensive collateral estoppel where a defendant has previously been convicted under the criminal provisions of RICO. *See*

*County of Cook v. Lynch,* 560 F.Supp. 136 (N.D. Ill.1982); *Anderson v. Janovich,* 543 F.Supp. 1124 (W.D.Wash 1982); *State Farm Fire & Casualty Co. v. Caton's Estate,* 540 F.Supp. 673 (N.D. Ind.1982). *See also* 18 U.S.C. 1964(d) (estopping a defendant from denying the essential allegations of a criminal conviction in any subsequent civil proceeding brought by the United States).

with the results. This Court finds this rule both practical and wholesome.

To state this point in the language of tort, HMK has failed to prove that defendants' conduct was the proximate cause of its damages. Section 1964 requires that there be a discernible causal connection or "nexus" between the acts of the defendants and any harm to plaintiffs. *Sedima, S.P.R.L. v. Imrex Co.,* — U.S. —, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985); *Waste Recovery Corp. v. Mahler,* 566 F.Supp. 1466 (S.D.N.Y.1983). Even assuming the existence of fraud, HMK has failed to prove this connection. The Board's decisions were an intervening and purifying cause.[6]

■ Although the Court finds this reasoning conclusive, it now turns to the more traditional doctrines of claim and issue preclusion, since these too require that the RICO claims relating to these events be dismissed. In determining the preclusive effect of this prior state court judgment, the Court must examine Virginia law on preclusion and give the same full faith and credit to the judgment that it would receive in the state courts. 28 U.S.C. § 1738. *Migra v. Warren City School Dist. Bd. of Education,* 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). This procedure applies to both claim and issue preclusion, whether or not the subsequent action falls within the exclusive jurisdiction of the federal courts. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). Absent an exception to the full faith and credit statute, 28 U.S.C. § 1738, state law determines the preclusive effect of a prior state judgment, even if the subsequent action involves a claim in the exclusive jurisdiction of the federal courts. *Marrese,* 105 S.Ct. at 1332.

This Court finds that the principles of both *res judicata* and collateral estoppel bar the relitigation of the RICO claims relating to the zoning decisions. Under generally accepted principles of *res judicata* or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. at 94, 101 S.Ct. at 414. Plaintiff's RICO claim could and should have been brought in state court since it mirrors the prior state claims. In its various bills of complaint,

---

**6.** This case is strikingly similar to *County of Cook v. Midcon Corp.,* 773 F.2d 892 (7th Cir. 1985). In that case, the plaintiffs claimed various RICO violations on the part of a utility company, Peoples Energy, and its subsidiaries, Peoples Gas Light and Coke Co. and North Shore Gas Co. Allegedly, the subsidiaries engaged in a scheme to defraud which began when they obtained rate increases on the basis of intentional misrepresentations. Thereafter, they diverted the revenues derived from the rate increases by paying dividends to Peoples Energy, which in turn invested the proceeds in nonutility subsidiaries. The scheme allegedly came to fruition when Peoples Energy reorganized and divested the nonutility subsidiaries to Midcon Corporation.

Before the RICO suit was filed, a state court had approved the dividend payments and the reorganization. To overcome any claims of estoppel, plaintiffs claimed that the rate increases, not the dividends and reorganization, formed the core of their scheme to defraud. Despite this argument, the Seventh Circuit found them collaterally estopped, stating that "plaintiffs are attempting to make their allegations that the rate increases were fraudulently obtained sound different from the issues resolved in the state court suit by arbitrarily separating these allegations from those related to the other events leading up to and including the reorganization." *Id.* at 901.

HMK is attempting a similar feat. It is challenging actions taken by staff members and other defendants prior to decisions by the County Board of Supervisors and is claiming that these should be examined independently for fraud. However, the Board is the only entity legally responsible for the actions which allegedly hurt HMK. If its decisions are approved, HMK has no further remedy. It cannot examine all of the minutia of events leading up to these decisions for further evidence of fraud.

This reasoning applies to all of plaintiff's prior suits, including those filed in federal court. In all, the County was the only entity legally responsible for the actions at issue and thus was the only party properly sued. HMK cannot now evade the preclusive effect of these suits by naming parties who helped prepare the County but did not make the ultimate decision.

plaintiff alleged that the defendants "conspired to improperly favor the development and use of the Call tract" through these zoning decisions. *See, e.g.,* Bill of Complaint, *M.K. Realty Corp. v. Sigma Development, Inc.,* Chancery No. 11494–83 (Chesterfield Circuit Court) ¶ 48. Only the RICO label was missing.

Plaintiff contends that it could not have brought its RICO claim in state court because RICO falls within the exclusive jurisdiction of the federal courts. In support of this contention, plaintiff cites a plethora of decisions, mainly from state courts, finding exclusive jurisdiction. *See, e.g., Kinsey v. Nestor Exploration, Ltd.,* 604 F.Supp. 1365 (E.D.Wash.1985); *Main Rusk Associates v. Interior Space Constructors,* 699 S.W.2d 305 (Tex.Civ.App.1985); *Greenview Trading Co., Inc. v. Hershman & Leicher, P.C.,* 108 A.D.2d 468, 489 N.Y.S.2d 502 (1985). However, the reasoning of these cases is uncompelling.

█ Normally, state courts are presumed to have concurrent jurisdiction over federal statutes. *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981). This presumption can only be rebutted "by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between the state court jurisdiction and federal interests." *Id.* The state decisions plaintiff cites rebut this presumption primarily by relying on the fact that RICO is modeled after federal antitrust. Federal antitrust lies within the exclusive jurisdiction of the federal courts.

This analogy is too weak to overcome the normal presumption that state courts have concurrent jurisdiction with federal courts. Admittedly Congress patterned the RICO treble damages after federal antitrust, but it did so simply to encourage enforcement of RICO by private citizens. *See Sedima,* 105 S.Ct. at 3280–81 (reviewing the legislative history of the act). Double and treble damages are common in both federal and state court and are totally unrelated to the issue of jurisdiction. *See, e.g.,* Va.Code §§ 55–216 (providing for treble damages

for waste during the pendency of a suit); 56–5 (providing for treble damages for injury to the property of a public service corporation). Since in all other respects RICO differs greatly from federal antitrust, the need for exclusive federal jurisdiction under the antitrust statutes cannot justify a similar result under RICO.

Nor can the Court perceive any indication in either the language of the statute or in legislative history that jurisdiction should be exclusive. As one of the principal draftsmen of RICO has stated, "[t]here is nothing on the face of the statute or in the legislative history" that touches on the question of concurrent jurisdiction. "[N]o one even thought of the issue." *See Greenview Trading,* 489 N.Y.S.2d at 505 (quoting G. Robert Blakey).

The only compelling argument for exclusive jurisdiction is that several of the predicate acts fall within the exclusive jurisdiction of the federal courts. Arguably, this demonstrates a clear incompatibility between state and federal jurisdiction, but the Court finds that even this does not rebut the presumption of concurrent jurisdiction. First, in adjudicating a RICO case, state courts only need determine whether the alleged predicate acts did or did not occur. This type of factual finding is unlikely to involve any complex interpretation of the underlying federal statutes, which would require exclusive jurisdiction. Second, as a practical matter, state courts are unlikely to find themselves in the position of interpreting and applying the underlying federal statutes. The vast majority of RICO cases involve garden variety state law fraud, where the plaintiff has simply seized upon RICO to obtain federal jurisdiction, treble damages, and attorney fees. If anything, RICO involves federal courts in the adjudication of state law claims, rather than the other way around. *See Sedima,* 105 S.Ct. at 3287 n. 16.

█ For these reasons, this Court finds that jurisdiction over RICO is concurrent, not exclusive. This finding is supported by the one appellate court to express an opinion on the subject. *See County of Cook v.*

*Midcon Corp.,* 773 F.2d 892, 905 n. 4 (7th Cir.1985) (suggesting that jurisdiction is concurrent but finding it unnecessary to rule on the issue). *See also Chas. Kurz. Co. v. Lombardi,* 595 F.Supp. 373, 381 n. 11 (E.D.Pa.1984); *Luebke v. Marine National Bank,* 567 F.Supp. 1460, 1462 (E.D. Wis.1983).

■ Even if plaintiff were not barred by the principles of *res judicata,* it would be collaterally estopped from relitigating the question of fraud. In general, collateral estoppel precludes relitigation of issues in a subsequent proceeding when (1) the party against whom the estoppel is asserted was a party to the prior adjudication; (2) the issues which form the basis of the estoppel were actually litigated and decided on the merits in the prior suit; (3) the resolution of the particular issues was necessary to the court's judgment; and (4) those issues are identical to issues raised in the subsequent suit. *See Allen v. McCurry,* 449 U.S. at 94, 101 S.Ct. at 414; *Norfolk & Western Ry. Co. v. Bailey Lumber Co.,* 221 Va. 638, 272 S.E.2d 217 (1980); *Bates v. Devers,* 214 Va. 667, 202 S.E.2d 917 (1974).

HMK does not contest that all of the parties in the present suit were parties or privies of parties in the prior state suit.[7] Nor does it really contest that the issue of fraud and conspiracy was litigated and decided on the merits in the prior suit. It disagrees primarily as to whether Judge Gates decision on the matter of fraud was necessary.

HMK argues that fraud was irrelevant to the determination of the state suit since, under Virginia law, legislative intent cannot be analyzed in determining the validity of legislative decisions. As noted above,

evidence on intent is not even admissible at trial. While HMK is correct in its reading of Virginia law, the Court finds HMK's argument disingenuous given the stance HMK took in the state court. HMK pressed its allegations of fraud and conspiracy throughout its state litigation, and Judge Gates recognized this in his letter-opinion. It used these allegations as background to try to persuade Judge Gates that the Board's decisions were arbitrary and capricious. Given HMK's injection of the issue into the case, and given Judge Gates' ruling on the matter, the Court finds that further litigation on this matter is collaterally estopped.

(b) *Condemnation of the HMK property:*

■ As with the zoning decisions, HMK has previously litigated the condemnation of its property. On November 6, 1984, HMK filed suit in federal court against the County and Harold King, Commissioner of VDH & T, charging that they conspired with Boulders to deprive HMK of its property for private, rather than public, use. The Honorable Judge Warriner of this Court ruled that HMK's claim was not ripe for adjudication because title had not yet vested in the Commonwealth. *See HMK Corp. v. County of Chesterfield,* 616 F.Supp. 667 (E.D.Va.1985). HMK noted an appeal of this ruling to the Fourth Circuit but subsequently withdrew the appeal. To date, there has been no final state court decision on whether or not the taking was constitutionally valid and for a public use.

This Court refuses to act in an appellate capacity over Judge Warriner and considers itself bound by his rulings. It therefore dismisses all aspects of this case relat-

---

**7.** The defendants in the present suit are: (1) Richard L. Hedrick, Chesterfield County Administrator; (2) Stanley R. Balderson, Director of the Chesterfield County Department of Planning; (3) John C. Walsey, President of Sigma Development, Inc.; (4) Barry S. Blumbery, Secretary/Treasurer of Sigma Realty, Inc.; (5) Sigma CJ; (6) Petula Associates; (7) Harold C. King, Commissioner of VDH & T; (8) Jack S. Hodge, assistant Chief Engineer of VDH & T; and (9) Jane or John Does 1–30. The defend-

ants not named in the state suits were Hedrick, Walsey, Blumberg, Petula Associates, King and Hodge.

The Court finds the absence of King and Hodge in the prior suits irrelevant since they are alleged to be part of the conspiracy formed by the other defendants. If the state court found that the other defendants did not conspire against HMK, then the conspiracy claim against King and Hodge must fail. More than one party is required for a conspiracy.

ing to the condemnation on the grounds that the issue is not ripe. Moreover it agrees with Judge Warriner that the state court's ruling, when made, will dispose of the matter completely. At that point, HMK will have no further claims before this Court under RICO.

In the prior suit, HMK argued that there were no adequate provisions for damages in state court if, in fact, there was a conspiracy to deprive plaintiff of its property. Judge Warriner noted in response that HMK would not be entitled to further damages whichever way the state court decided. If the state court found that the property had been taken for a public use, then HMK would receive "just compensation" for its property. The taking would be legitimate and valid, so that HMK would have no further claim. If the state court found that the property was taken for a private use, again HMK would have no claim for additional damages. Any other damages suffered would be "only those damages that occur as a part of living and doing business in a civilized society" and thus would not be compensable:

> Every time a property owner is successful, in whole or in part, in a challenge to a governmental regulation—whether it be a zoning ordinance, health regulation, or traffic law—he is almost certain to suffer some temporary harm in the process. At the least he will usually incur significant litigation expenses and frequently he will incur substantial revenue losses because the use of his property has been temporarily curtailed while the dispute is being resolved.... [There is no] utopian requirement that [an] enforcement action may not impose any

cost upon the citizen unless the Government's position is completely vindicated. *Williamson County Regional Planning Commission v. Hamilton National Bank* [—— U.S. ——], 105 S.Ct. 3108, 3124–27 [87 L.Ed.2d 126] (1985) (Stevens, J., concurring).

*HMK Corp. v. County of Chesterfield,* 616 F.Supp. at 671.

(c) *Powhite Extension and Collector-Distributor System:*

■ All of HMK's claims relating to the Powhite Extension and the collector-distributor system are similarly barred. On March 15, 1984, HMK sued the County and Richard Hedrick, the county administrator, challenging the contract HMK was forced to sign to have its proposal forwarded to the VDH & T. It contended that certain of the provisions imposed unconstitutional conditions. This Court agreed, again in an opinion by Judge Warriner, and enjoined the enforcement of the provisions in question. *HMK Corp. v. County of Chesterfield,* C/A 84–0170–R (E.D.Va. August 9, 1984).[8]

The Court then held a hearing to determine the damages that HMK had incurred. Because of the dispute over the contract, HMK's proposal reached the VDH & T almost one year after it would have originally. The Court awarded damages for the increase in the engineering costs, discounted by plaintiff's ability to invest these funds.

The Court left unresolved only one issue of damages and that issue appears still to be open. HMK had moved for a general continuance on damages, if any, caused by

---

**8.** HMK contested the constitutionality, both state and federal, of paragraphs 5 and 6 of the contract. Judge Warriner summarized the obligations imposed by these paragraphs as follows:

(1) HMK must convey the necessary real estate for the right-of-way for the Powhite Parkway Extension if the requested design is included in the project.

(2) If such conveyance is "required as a condition of rezoning," HMK will receive no compensation for the real estate.

(3) If such conveyance is not required as a condition of rezoning, HMK will receive com-

pensation based upon an appraisal rather than upon statutorily prescribed eminent domain proceedings.

(4) HMK must pay the construction costs of the proposed collector-distributor road network should it be built.

With respect to the last provision, the court found only that this requirement could not be a valid condition for the County's agreement merely to forward the plans to VDH & T. The court did not address whether this might be valid under other circumstances, such as a condition of rezoning.

defendants' refusal to allow "phasing" for the design work. According to plaintiff, if there had been no unconstitutional contract provisions, it could have designed the collector-distributor roadway network in two phases. The first phase would cost approximately $200,000 to $400,000 and implementation of that design phase would allow sufficient access to accommodate a million square foot office development. The second phase would provide access for a full three million square foot complex—for which HMK had yet to secure rezoning. This second phase would cost another $800,000 to $1 million.

If there had been no delay in forwarding the plans, HMK would have known whether it had the rezoning before the design of phase two was necessary. Assuming that no zoning change was granted at all, plaintiff could abandon the second phase before it was necessary to pay for Part Two, and would only have had to expend $200,000 to $400,000 rather than the full $1.2 million. According to plaintiff, the time delay caused by the unconstitutional contract provisions made it impracticable to phase the design work. Therefore, plaintiff was being forced to expend $1.2 million to insure that it had a sufficient collector-distributor roadway network accommodating its proposed three million square foot office/retail complex, and, if the zoning request were turned down, plaintiff would be stuck with a white elephant costing $1.2 million.

In response to this dilemma, the Court continued the case to await the result on plaintiff's proposal for rezoning. No final determination was ever made. It appears from this Court's review of the record that plaintiff ultimately received the rezoning it desired and that it was not therefore forced to waste its money on designing an unneeded system. Plaintiff has thus suffered no further damages. However, this matter has not been argued to the Court and was explicitly left open by Judge Warriner. Accordingly, the Court is willing, should counsel so desire, to hear argument on this point and award damages should they appear warranted.

Notwithstanding the one issue left open, this prior federal suit bars all other allegations, both as to the events themselves, and as to damages incurred. All significant events relating to plaintiff's present RICO claim had already occurred at the time of this first federal suit. Therefore, plaintiff should have raised any claims of fraud at that time. Having not done so, it is now barred from raising this claim. *See Allen v. McCurry,* 449 U.S. at 94, 101 S.Ct. at 414.

## III. STATUTE OF LIMITATIONS:

■ The statute of limitations for RICO is an additional independent bar to the suit. Like many other areas in federal civil law, RICO contains no federal statute of limitations expressly applicable to this suit. This does not mean that Congress intended that there be no time limit within which to bring an action. Rather, where "Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so." *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985)

*Wilson* provides the appropriate procedure a court should follow in deciding what limitations period should govern a federal cause of action containing no express statute of limitations.

First, the court must determine whether one limitations period should apply to all RICO actions or whether different periods should apply depending on the particular facts of the case. Second, the court must characterize the RICO action before it (or RICO actions generally, depending on the answer to the first question), or to put it another way, the court must analogize RICO to a state cause of action. Third, the court must determine what state limitations period applies to the kind of action the court has found RICO to be. Finally, the court must determine whether that period is inconsistent with the policies of RICO, and if

so what limitations period better serves those policies.

*Electronic Relays (India) Pvt. Ltd., v. Pascente,* 610 F.Supp. 648, 649–50 (N.D.Ill. 1985).

One uniform statute of limitations should apply, at least within a state, to RICO actions. The Court concludes that the limitations period should not be based on the underlying predicate acts. If such were the case, parties, attorneys, and courts would waste scarce resources over "useless litigation on collateral matters," *Wilson,* 105 S.Ct. at 1947, due to the uncertainty of such a scheme. RICO actions can be brought upon widely differing scenarios, so that many situations could involve two or more limitations periods. A court would then be confronted with selecting among disparate limitations periods within the same case. In other words, "subjecting civil RICO claims to the statute of limitations of the predicate acts represents an unworkable solution in all but a few cases." *Morley v. Cohen,* 610 F.Supp. 798, 809 (D.Md.1985). The complexities become even deeper if a predicate act is susceptible to the application of more than one limitations period. *Electronic Relays,* 610 F.Supp. at 650 and n. 1. A much more workable scheme is to employ a uniform statute of limitations applicable to all RICO actions brought within the state.

The next step the Court takes is characterizing a civil RICO claim. This is a matter of federal law, *Wilson,* 105 S.Ct. at 1944 and n. 19, which hinges upon the "elements of the cause of action, and Congress' purpose in providing it." *Id.* at 1943. Characterizing the chameleon-like civil RICO claim is a difficult task, since it is neither fish nor fowl. The federal courts, in analogizing RICO to state statutes, have differed dramatically. *See Electronic Relays,* 610 F.Supp. at 650–51 (col-

lecting cases). Underlying its civil remedy can be acts " 'chargeable' under several generically described state criminal laws, any act 'indictable' under numerous specific federal criminal provisions, including mail and wire fraud, and any 'offense' involving bankruptcy or securities fraud or drug-related activities that is 'punishable' under federal law. § 1961(1)." *Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 3278, 87 L.Ed.2d 346 (1985) (footnote omitted). The vast array of predicate acts on which civil RICO liability is based indicates Congressional concern with the far-reaching and diffuse nature of organized crime. "[T]he RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983).

As a result of its all-encompassing scope, it is not surprising that courts have been unable to find an analogous state statute. Few states have RICO counterparts, and courts have sometimes struggled when locating the appropriate pigeonhole in which to fit a civil RICO claim.

No specific Virginia statute mirrors RICO. Because of its wide sweep, one cannot simply catagorize a claim by the factual nature of its predicate acts. Doing so embroils courts and litigants in the confusion referred to earlier, raising the specter of differing limitations periods within the same suit or based merely on the factual differences between RICO claims. The Court therefore rejects the parties' invitations to analogize RICO to any specific statute.[9]

Many courts have borrowed limitations periods from state fraud causes of actions. *E.g., Silverberg v. Thomson McKinnon Securities, Inc.,* 787 F.2d 1079 (6th Cir.1986); *Eisenberg v. Gagnon,* 564 F.Supp. 1347

**9.** The Court also finds that the Virginia five-year limitations period, Va.Code § 8.01–243(B), for injury to property does not apply. Although injury to property or business is an element of a civil RICO action, 18 U.S.C. § 1964(c), such injury is not the distinguishing aspect of RICO. RICO's central feature is not injury to property, but personal liability so to eliminate the effects of organized crime on legitimate business. The five-year statute of limitations in § 8.01–243(B) applies to tort actions for property damage. The Court cannot characterize a RICO action as injury to property; the two do not fit. *Electronic Relays,* 610 F.Supp. at 652.

(E.D.Pa.1983). While the Court first observes that, in Virginia, the end result would be the same,[10] its analysis is somewhat different. Fraud covers many situations, but RICO covers more: "the common law fraud analogy falls far short of capturing the multitude of factual bases on which RICO can be based." *Electronic Relays*, 610 F.Supp. at 651; *see also Morley v. Cohen*, 610 F.Supp. 798, 808–09 (D.Md. 1985) (rejecting fraud analogy). The elements of fraud and RICO differ substantially, as do the purposes of the two actions. *Cf. O'Hara v. Kovens*, 625 F.2d 15, 18 (4th Cir.1980), *cert. denied*, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) (requiring "a commonality of purpose between the federal right and the state statutory scheme").

The Court's conclusion applies as well to the Virginia business conspiracy statute, Va.Code § 18.2–500. Again, the elements and purposes of the two statutes diverge. Where the Virginia act requires "a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business," *Allen Realty Corp. v. Holbert*, 227 Va. 441, 318 S.E.2d 592, 596 (1984), a RICO § 1962(c) cause of action is made out by proof of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima*, 105 S.Ct. at 3285.

The business conspiracy statute redresses a much narrower range of conduct than does RICO.

the Virginia Conspiracy Statute ... appl[ies] to any malicious conduct that injures business. However, such con-

duct must be directly aimed toward damaging the business, trade, reputation or profession: The injury must not be a result of an action taken for mere personal gain.

*Nationwide Mutual Fire Insurance Co. v. Jones*, 577 F.Supp. 968, 970 (W.D.Va.1984) (combination of persons seeking to defraud an insurance company, for their own personal gain, not reached by the statute); *see also Buschi v. Kirven*, 775 F.2d 1240 (4th Cir.1985).

RICO spans not only that conduct but more, since Congress intended it to stamp out organized crime wherever it exists and in whatever form it holds. *Sedima*, 105 S.Ct. at 3286 ("RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime"); *see also United States v. Turkette*, 452 U.S. 576, 589, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981) (Congressional purpose in enacting RICO was "to seek the eradication of organized crime in the United States"). Although the two statutes redress similar injuries, RICO is aimed at a much broader range of behavior: it does cover conduct undertaken for personal enrichment, and it does embrace actions not specifically undertaken with the intent to injure a business. The Court therefore concludes that the Virginia business conspiracy act is not an appropriate state statute from which to borrow a statute of limitations for RICO.[11]

Because of the inability to analogize RICO to a Virginia statute, the Court turns to Virginia's catch-all limitations period.[12]

---

**10.** The Virginia Supreme Court, in *Pigott v. Moran*, 231 Va. 76, 341 S.E.2d 179 (1986), applied the one-year general limitations period of Va. Code § 8.01–248 to a common law fraud action. Thus, if the Court analogized RICO to fraud, then this limitations period would apply.

**11.** Past decisions of this Court, interpreting the old Virginia statute of limitations scheme, have held that a five-year limitations period applies to this action. *Federated Graphics Cos. v. Napotnik*, 424 F.Supp. 291 (E.D.Va.1976). Whether the reasoning of *Pigott v. Moran*, 231 Va. 76, 341 S.E.2d 179 (1986) changes this result is a decision left for another day.

**12.** Until now, the Court's path has paralleled that taken by Judge Hart in *Electronic Relays*. He ultimately determined that RICO should be characterized as a treble damages action for purposes of selecting the appropriate statute of limitations. 610 F.Supp. at 651. He then borrowed the 2-year statute from Ill.Rev.Stat. ch. 110, § 13–202 ["Actions .... for a statutory penalty"]. This Court does differ somewhat in this characterization, since RICO is much more than a cause of action having treble damages as its remedy. Additionally, Virginia has no statutory penalty provision comparable to the Illinois statute, and no Virginia treble damages remedy flows from a cause of action suitable as a bor-

Other courts have followed this approach. *E.g., Durante Bros. & Sons, Inc. v. Flushing National Bank,* 755 F.2d 239 (2d Cir. 1985), *cert. denied,* —— U.S. ——, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985) (as RICO has no state-law counterpart, New York's 3-year limit on actions to enforce a liability created by statute applies): *Compton v. Ide,* 732 F.2d 1429 (9th Cir.1984) (California's 3-year period for actions based on statute); *Victoria Oil Co. v. Lancaster Corp.,* 587 F.Supp. 429 (D.Col.1984) (Colorado's 3-year period for actions based on statute). Indeed, district courts within this circuit have taken this path. In *Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985), Judge Ramsey adopted the Maryland 3-year limitations period for civil actions at law. Judge Erwin, in *Seawell v. Miller Brewing Co.,* 576 F.Supp. 424 (M.D.N.C.1983), borrowed North Carolina's 3-year statute of limitations for statutory-liability claims.[13]

Va.Code § 8.01-248 [Personal actions for which no other limitation is specified] provides that "[e]very personal action, for which no limitation is otherwise prescribed, shall be brought within one year after the right to bring such action has accrued." The Court must determine whether this 1-year limit conflicts with the federal policy underlying RICO.

Congress has stated that RICO "shall be liberally construed to effectuate its remedial purposes." Section 904 of Title IX, Pub.L. 91-452, 84 Stat. 947. At first blush, a 1-year limitations period seems rather short. But, as the *Electronic Relays* court noted, a "violation of RICO involves a very serious injury; a kind of injury that cannot go unnoticed by the victim, at least not for long." 610 F.Supp. at 653 (two years is "certainly long enough to realize one has been injured by a RICO violation and to

bring suit"). The same applies for a 1-year period: any injury occasioned by a RICO violation should be apparent within a short period of time. One year provides adequate time within which to bring suit after learning of the violation and performing any necessary pre-filing investigation.

Additionally, tolling and accrual doctrines will "ensure that no diligent RICO plaintiff will find his claim time-barred." *Id.; Bowling v. Founders Title Co.,* 773 F.2d 1175, 1178 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986) ("the general federal rule, which provides that the statute of limitations begins to run when a plaintiff knows or should know of the injury, applies in civil RICO cases"); *Suslick v. Rothschild Securities Corp.,* 741 F.2d 1000 (7th Cir.1984); *Compton v. Ide,* 732 F.2d 1429 (9th Cir.1984); *Blanck v. McKeen,* 707 F.2d 817 (4th Cir.1983), *cert. denied,* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983). These principles will adequately provide for the preservation of valid RICO suits.

Finally, other courts have applied a 1-year limitations period to civil RICO actions. *Bowling v. Founders Title Co.,* 773 F.2d 1175 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986); *Moore v. A.G. Edwards & Sons, Inc.,* 631 F.Supp. 138, 144 (E.D.La.1986) ("Application of the one year period in no way frustrates, or is inconsistent with, the federal policy underlying RICO."); *Bush v. Rewald,* 619 F.Supp. 585, 603 (D.Hawaii 1985).

The Court therefore concludes that one year is the applicable statute of limitations for civil RICO actions brought in Virginia. HMK filed its complaint on Jan. 6, 1986. The factual recitation opening this Opinion shows that HMK's RICO claim accrued

rowing statute for RICO statute of limitations purposes. If Virginia had an analogous statute, this Court's decision might be different. Still, Judge Hart's ultimate result is similar to this Court's, in that a general limitations period, prescribed by statute, is adopted.

**13.** In *Wilson,* the Supreme Court decided that catchall periods of limitation for statutory claims were not appropriate limitations periods

for 42 U.S.C. § 1983. 105 S.Ct. at 1948. The Court reasoned that Congress likely did not intend this result, due to the relative scarcity of statutory claims when § 1983 was enacted. With respect to RICO, however, such catchall limitations periods, as well as statutory ones, were in wide use when Congress passed RICO in 1970.

well before January, 1985, and that HMK knew, or should have known, of this by that time.[14] As the collateral estoppel analysis demonstrates, HMK only turned to RICO after failing to obtain favorable decisions in other forums and actions. Indeed, Congress intended civil RICO to be an extraordinary remedy in the fight against organized crime. It was never intended to be a sword of Damocles, held in abeyance until aggressive litigants, having failed in conventional actions, unsheathed the RICO sword in their arsenal for use in yet another lawsuit.

An order shall issue in accordance with this Memorandum Opinion.

---

**14.** As the Court is at the summary judgment stage, it must consider whether there is any genuine question that HMK in fact knew, or at least reasonably should have known, of the RICO violation and its injuries by January, 1985. The Complaint and HMK's involvement in prior suits leaves no doubt that HMK was on sufficient notice to have brought a RICO action well before then. The plaintiff was extensively involved in the zoning process by virtue of its position as a competing developer, and throughout 1983 and 1984, it filed repeated lawsuits involving the development of JCDA, alleging broad conspiracies between private individuals and public officials. There is no material issue of fact precluding summary judgment on this aspect of HMK's claim. As it knew, or should have known, the factual basis for its RICO claims well before January of 1985, the Court holds that the claims are time-barred.